[No. S064574. Aug. 13, 2009.]

THE PEOPLE, Plaintiff and Respondent, v.
MICHAEL MATTHEW MARTINEZ, Defendant and Appellant.

**COUNSEL**

Paul J. Spiegelman, under appointment by the Supreme Court, for Defendant and Appellant.

Bill Lockyer and Edmund G. Brown, Jr., Attorneys General, Robert R. Anderson, Chief Assistant Attorney General, Gerald A. Engler, Assistant Attorney General, Bruce Ortega and Jill M. Thayer, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**GEORGE, C. J.**—Defendant Michael Matthew Martinez appeals from the judgment of death imposed by the Alameda County Superior Court following his conviction of the first degree murder of Lisa White (Pen. Code, § 187)[1] and the premeditated, attempted murder of Tara R. (§§ 187, 664, subds. (a), (f)). In connection with the murder charge, the jury found true the allegation that defendant personally used deadly weapons, specifically a hammer and a

---

[1] Statutory references are to the Penal Code unless otherwise indicated.

knife. (§ 12022, subd. (b)(1).) In connection with the attempted murder charge, the jury found true the allegation that defendant inflicted great bodily injury. (§ 12022.7.) The jury found true a special circumstance allegation that the murder occurred while defendant was engaged in the commission, attempted commission, or flight after the performance of a lewd act upon a child under the age of 14 years, in violation of section 288. (§ 190.2, subd. (a)(17)(E).) After the penalty phase of the trial, the jury returned a verdict of death and the trial court imposed a sentence of death, also imposing a sentence of life imprisonment for the attempted murder, two one-year terms of imprisonment for the weapons enhancements, and a three-year term for the great-bodily-injury enhancement. Defendant's appeal is automatic. (§ 1239, subd. (b).)

We affirm the judgment in its entirety for the reasons set forth below.

## I.

## FACTS

### A. *Guilt Phase Evidence*

#### 1. *Prosecution evidence*

The murder victim, Lisa White, resided in Hayward with her daughter Amanda O., then two years of age. White's other daughter, Tara R., was 10 years of age at the time of the charged offenses. According to Tara's grandmother, Tara, after having been sexually abused by Amanda's father, was removed from her mother's home by the local child protective services agency and was placed for a period of approximately two years in a residential facility for psychiatric treatment. Tara visited her mother and her sister from time to time on weekends and for holidays.

White occasionally employed Lisa Gamaza as a babysitter. According to Gamaza's testimony, White chastised Gamaza for permitting her boyfriend, defendant, to visit while Gamaza tended Tara and Amanda. White explained to Gamaza that Amanda's father had sodomized and orally copulated Tara, and that Tara was in residential treatment as a result of that abuse. Gamaza also testified that defendant had drawn a picture for Tara on one occasion, depicting a cross dripping with blood, surrounded by flowers. Defendant ordinarily carried a Buck knife on his hip. Gamaza mentioned that White and defendant had engaged in methamphetamine sales with one another. Gamaza's relationship with defendant ended in May 1989.

The charged offenses occurred in the early morning hours of December 22, 1990, when Tara was at her mother's residence for her Christmas visit.

According to the testimony of defendant's acquaintance, Ron Casuga, defendant spent the preceding evening of December 21 at defendant's residence with Casuga and Casuga's girlfriend, Shonette Leite. The group drank beer and smoked marijuana. According to Casuga, they moved to a bar, where they were joined by Jennifer Hartz. At approximately 11:00 p.m., the group returned to defendant's residence and consumed more beer and marijuana. Casuga testified that defendant departed with his neighbor, James Dyer, at approximately midnight. Casuga and the other members of the group departed from defendant's residence at approximately 3:00 a.m. Casuga testified he left defendant a note explaining that because defendant had not returned, the rest of the group had departed.

Dyer testified that late in the evening of December 21, 1990, defendant requested a ride to a nearby residence, which Dyer identified at trial as White's home. According to Dyer, defendant entered the residence, then emerged to direct Dyer not to wait for him, because he would use the occupant's vehicle to return home.

Tara testified that in the early morning hours of December 22, 1990, she was sleeping in her mother's room with her younger sister, Amanda, when she felt someone lift her up and carry her to her own room. She discovered that she had been transported by defendant, with whom she was acquainted. Tara testified that he ordered her to remove her clothing, then raped and sodomized her and forced her to orally copulate him. Defendant informed Tara he would kill her and her mother if she told anyone what he had done. Tara testified further that defendant struck her on the head and arm with a hammer. She lost consciousness, then awoke to hear her mother slam the door of her automobile and approach the residence. Defendant ran out of Tara's room. Tara observed him hiding behind the front door. Tara testified that when her mother entered the residence, Tara screamed a warning and that defendant then struck White on the head repeatedly with a hammer. After White fell to the floor, defendant went to the kitchen and retrieved a knife. He stabbed White in the neck. Tara testified that she ran to a neighbor's residence, pursued by defendant.

Tara's testimony was marked by hostility to defense counsel, impulsive outbursts, and her refusal to answer questions until ordered to do so by the court. Her testimony contained some inaccuracies, such as her assertion she had encountered defendant in her mother's residence, confronted him, and disarmed him two days prior to the commission of the crimes—when Tara actually was in her group home in Sacramento. In closing argument, the prosecutor acknowledged that Tara's testimony was inaccurate in some relatively unimportant respects and reflected her psychiatric problems. The prosecutor pointed out, however, that her testimony was consistent in all

significant respects with statements she made to police officers and medical examiners immediately following the crimes.

Prosecution witness John Feeny confirmed that in the early morning hours of December 22, 1990, Tara appeared at his residence, which adjoined White's, and tapped on his front door. He testified that she was clothed only in sweatpants, was bleeding from the face and chest, and wept uncontrollably. At first Tara informed him that her mother had dropped her off in downtown Hayward and a man had beaten her. Feeny was skeptical because he had observed White leave her home some 25 to 30 minutes prior to Tara's arrival. Feeny had spoken to White, who had explained she was going to buy cigarettes. He had assumed there was another adult present at White's residence to care for Tara and Amanda during her absence.

Feeny testified that shortly after he heard White's vehicle return, he heard loud banging, as if someone were affixing a nail to a wall to hang a picture. Approximately 10 minutes later, Tara arrived at his doorstep.

Feeny testified that when he contacted a police department emergency dispatcher, Tara became distraught and stated that she had been beaten and raped by her mother's friend Mike, that Mike had killed her mother by hitting her on the head with a hammer, and that her mother's bloody body was lying on the floor of her home. A tape recording of the 911 call was played for the jury and confirmed Feeny's account of Tara's statements to the police dispatcher. Feeny's testimony also was confirmed by that of his stepdaughter, Kimberly Hoskins, who was present when Tara arrived at Feeny's residence.

Casuga, who testified concerning defendant's movements on December 21, 1990, also stated that when he visited defendant on the morning of December 22, defendant informed him he had injured someone and thus had blood on his clothing. According to Casuga, defendant instructed him to say defendant had been with Casuga all night if anyone should ask.

Prosecution witness Linda Pedersen testified that defendant contacted her by telephone at approximately 3:00 a.m. on December 22, 1990. Pedersen resided near White's residence. Defendant informed her that he was stranded at a gas station located some six blocks from Pedersen's home, and he pleaded with her to pick him up in her automobile. She was persuaded by his tone of desperation and drove to the gas station. Following defendant's instructions, she parked at the side of the station. Defendant emerged from a bathroom, jumped into her vehicle, and ordered her to drive away. Pedersen noticed a red stain on defendant's jeans and testified that he refused to explain his circumstances. Pedersen drove to her residence, where defendant used the telephone, and then drove defendant to his own apartment.

Prosecution witness Dyer testified that in the early morning hours of December 22, 1990, approximately three or four hours after he had driven defendant to White's residence, defendant knocked at his door and requested a ride to a grocery store. Dyer testified that defendant appeared nervous, and that he slumped in his seat as Dyer drove. Defendant informed Dyer he had a headache and needed to sleep. Dyer purchased a soporific for him, and then drove defendant back to defendant's residence.

Pediatric emergency physician William Hawk testified that when Tara arrived at Children's Hospital & Research Center Oakland (Children's Hospital) in the early morning hours of December 22, 1990, both bones in her left forearm were broken and she had suffered a laceration to her scalp that almost penetrated to her skull. Her face, chest, and legs were bruised, and her lips were swollen and lacerated. In Hawk's opinion, her head wound could have been inflicted by the claw of a hammer.

Hawk testified that during his medical examination, Tara stated that "Michael M." had threatened her and raped her. She also identified her attacker as Michael Martinez and described him as a Hispanic male who was approximately 25 years of age. Hawk testified that Tara informed him defendant had placed his finger and his penis inside her vagina. Although she initially reported that there had been no anal contact, subsequently she informed Hawk that defendant had placed his penis inside her rectum. Tara also informed Hawk that she had been attacked with a hammer. Hawk testified that his medical examination of Tara revealed trauma in the vicinity of the anus, denoting anal penetration, but there was no trauma to the vagina.

Alameda County Deputy Sheriff Claudette Center testified that on December 22, 1990, she responded to Feeny's residence, where she observed Tara bleeding profusely from a large head wound. Screaming and weeping, Tara repeatedly declared, "she's dead, I saw her fall down dead, he killed her, he fucked me, he hit me—I have to go back."

Center testified that her inspection of the crime scene at White's residence revealed a pool of blood on the mattress in Tara's bedroom, blood spattered on the walls of the bedroom, and drops of blood on the floor leading to the corner of the room. White's body was on the floor in a doorway between the kitchen and the living room of the residence. Her skull and face had been beaten in, and she was impaled to the floor with a knife through her neck. Her body was warm, and steam rose from the surrounding pools of blood. The front door was spattered with blood.

After inspecting the crime scene, Center followed Tara to Children's Hospital in Oakland. Center had past experience as a social worker treating

sexually abused children. She testified that at the hospital, Tara gave her an anguished account of her experiences that night. She testified that Tara informed her that defendant had carried her from her mother's bed to her own bed and, using graphic terms, Tara declared that defendant had raped her, sodomized her, and forced her to orally copulate him. Tara added that defendant warned her not to say anything about what he had done. He left the room and returned, then attacked her with a hammer and used "the sharp part" to strike her head. Center testified Tara informed her she heard her mother return, heard yelling and, after Tara left her bed, witnessed defendant strike her mother on the head multiple times. Tara stated she fled from the house, and then returned briefly with the objective of saving her younger sister, Amanda. She fled when she heard noises inside the residence, and climbed over the fence to reach Feeny's residence. Center testified that Tara displayed extreme emotional turmoil throughout the interview.

Alameda County Deputy Sheriff Dale Toussaint testified that he conducted two tape-recorded interviews of Tara, one on the morning of December 22, 1990, and one on the afternoon of the same date. The recordings were played for the jury. The transcript of the recorded statements reflects that Tara was sleepy, a condition the officer attributed to medication. Tara's statements were rambling, and it is difficult to determine whether she was offering a chronological account or merely blurting out each event as it occurred to her. The interview was terminated and recommenced after several hours in order to accommodate Tara's need for rest. At one point in her statements, Tara informed Toussaint that defendant was present in the residence before Tara went to bed on the night of the crimes, but subsequently she stated she was unaware of his presence until he woke her. She stated that while she slept, "mommy left and then he watched us, and then he put me in my room and started fucking me." She added that defendant removed her pants and underpants but not her shirt, and raped her and forced her to orally copulate him; that at some point while assaulting her, he retrieved a knife; that he left her room and returned with a hammer, with which he struck her; that she heard her mother enter the residence and heard banging; and that she heard defendant stab her mother and then ran to Feeny's residence. She would not acknowledge that she witnessed defendant's attack on her mother. She repeatedly sought to terminate the second interview.

Prosecution witness Sharon Smith, an Alameda County Sheriff's Office criminalist, testified that rectal, vaginal, and oral swabs taken from Tara on December 22, 1990, tested negative for semen. Semen was present, however, on the exterior and interior of Tara's underpants, which had been removed and examined when Tara arrived at the hospital. The underpants also bore blood and possible fecal stains. A sweatshirt removed from Tara's bedroom bore stains of semen and either fecal material or saliva on the lower front portion of the shirt. Tara's trousers bore bloodstains, but no evidence of

semen was discovered on them. Conventional testing for genetic markers indicated that defendant could not be excluded as the source of the semen stains on the underpants, although the result may have been influenced by the admixture of Tara's body fluids. Smith also testified that jeans seized from defendant's apartment bore bloodstains that were consistent with White's blood but not with Tara's or defendant's blood. Blood collected from the hammer discovered near White's body matched White's blood, but not defendant's or Tara's.

Samples from defendant's jeans and Tara's sweatshirt were submitted for DNA testing. The stains from defendant's jeans matched White's DNA profile in four of six chromosomal tests; the remaining two tests were inconclusive. The blood found on the hammer did not come from defendant's body. The DNA of the semen sample taken from the sweatshirt matched defendant's DNA profile in five of six chromosomal tests; the sixth was inconclusive. The frequency with which defendant's genetic profile would appear in the population was one out of 250 million persons belonging to the southwestern United States Hispanic population, one out of 760 million persons belonging to the Black population, one out of 890 million persons belonging to the White population, and one out of 480 million persons belonging to the southeastern Hispanic population.

White's body was examined for evidence of sperm but none was found. The cause of her death was acute trauma to the head, and her injuries were consistent with hammer blows. She also had been stabbed twice in the neck. When her body was discovered on the floor of her home, a knife had penetrated her neck and the floor beneath her. The handle of the hammer that was recovered near her body was split.

Prosecution witnesses Pedersen and Casuga testified they were present in defendant's residence on the evening of December 22, 1990, along with two other persons, when the police arrived and knocked on the door. Both witnesses testified that the officers announced several times that they had an arrest warrant. According to the witnesses, defendant directed all those present to remain silent, and then proceeded up the stairs to the second story. The police broke down the door and ejected Pedersen and the other occupants of the room.

Sergeant John Reasoner of the Alameda County Sheriff's Office testified that he and his partner went to defendant's residence on the evening of December 22, 1990, to serve an arrest warrant. Upon their arrival, they heard voices coming from inside the apartment. The officers identified themselves several times, then effected a forced entry. Reasoner testified that the arresting officers conducted a search for defendant, and that when they announced they

would release a police dog and began to ascend the stairs to the second story, defendant surrendered and was placed under arrest.

### 2. Defense evidence

Defendant testified in his own defense. He admitted that he killed White, but denied assaulting Tara or, indeed, even having seen her or having had any contact with her on the evening of White's death.

Defendant testified he had sold controlled substances to friends for approximately 10 years prior to committing the charged offenses. He testified that on December 21, 1990, he had been under the influence of methamphetamine and unable to sleep for six days. He described further heavy use of this drug at various points during that day. He felt "amped" or "unreal."

Defendant testified that he consumed alcohol and smoked marijuana in his apartment with Casuga and Leite. The party, joined by Hartz, proceeded to a bar. Defendant consumed two strong alcoholic drinks and ingested methamphetamine. The group returned to defendant's residence, where defendant drank two beers and ingested additional methamphetamine. Because White telephoned to say she wished to purchase methamphetamine, defendant secured a ride to her residence from Dyer. Before he reached White's residence, he visited Pedersen and ingested methamphetamine. At White's residence, defendant requested the use of White's automobile. Although they failed to agree on a price for his use of her vehicle, defendant returned to Dyer's vehicle to say he would not need a ride. Defendant gave Dyer some methamphetamine, and Dyer departed.

Defendant testified that he and White injected methamphetamine in Tara's empty, darkened bedroom. According to him, he and White had sexual intercourse on Tara's bed. Defendant testified he ejaculated on the bed. He claimed that he and White argued concerning his use of her vehicle. She demanded a gram of methamphetamine in exchange for his using the vehicle and departed to buy cigarettes, returning after five or 10 minutes. When she returned, the argument continued concerning trading methamphetamine for defendant's use of the vehicle. After White hit him in the chest, he pushed her. She then swung at defendant with a hammer. He became angry and struck her in the face. When she fell to the ground, he retrieved the hammer and used it to beat White's face and head. Defendant testified that the next thing he remembered was Pedersen arriving to give him a ride to her residence, and then to his own apartment. He did not realize he had killed White. He testified he did not observe Tara or interact with her that evening.

Defendant further testified that when the police arrived at his residence on December 22, 1990, they knocked on the door but failed to identify themselves. According to defendant, because the officers did not respond when he

questioned them, he mounted the stairs to reach an upstairs window that could afford a view of the front door. He denied requesting that the other persons present remain silent.

The defense presented the testimony of John Schlim, an expert on the subject of methamphetamine use. He testified concerning the generally deleterious effects of habitual methamphetamine use on the body, including sleeplessness, and on behavior, noting an increased incidence of sudden bursts of paranoia, hostility, and aggression. He also testified that tests of blood and urine samples extracted from White's body indicated a high level of methamphetamine intoxication at the time of her death. In Schlim's opinion, the tests demonstrated White had ingested a large dose of methamphetamine approximately 10 to 14 hours prior to her death.

### B. *Penalty Phase Evidence*

#### 1. *Prosecution evidence*

The prosecution introduced evidence implicating defendant in the uncharged murder of another woman, Christine Parks, whose body was discovered on October 29, 1989, in an alleyway next to an athletic field. The victim's dress had been pulled up above her waist. The entire body was smeared with blood and dirt and bore evidence of multiple blunt force traumas. In addition, there were 22 stab wounds, including multiple injuries to the face, neck, chest, arms, and hands. All had been inflicted while the victim was alive. Tire tread marks were evident in the dirt next to the body. Death was caused by the stab wounds and the blunt force injury. The latter was consistent with the victim's having been run over by an automobile. An autopsy disclosed that the victim had ingested multiple controlled substances.

In connection with this earlier incident, prosecution witness Denise Alden testified that defendant had borrowed an automobile from her. Early one morning in the autumn of 1989, defendant returned the vehicle in a badly damaged condition. Defendant's finger was lacerated, and his clothing bore bloodstains. The front end and one side of the vehicle had been damaged. The exterior had been cleaned but there were puddles of blood on the front passenger seat and on the floor.

Alden testified that defendant informed her he had witnessed a beating and had given aid to the victim, a man. She testified that according to defendant, the victim's assailants then attacked defendant. Defendant told her he had driven away, dropping off the victim at the latter's request. Alden testified that she witnessed defendant washing blood from a knife.

Alden further testified that she and defendant cleaned the interior of the vehicle at a carwash facility. The victim's handbag subsequently was discovered in a dumpster near the facility.

Alden's stepfather, Chester O'Steen, testified that when defendant returned Alden's vehicle in damaged condition, O'Steen directed defendant to show him the location where the purported attack had occurred and the vehicle had been damaged. Defendant did so, but there was no broken glass or evidence of paint or blood at that location to corroborate defendant's story.

Prosecution witness Gamaza testified that prior to defendant's commission of the presently charged offenses, defendant informed her he had killed a man by running him over with an automobile belonging to his then girlfriend, Denise Alden. According to Gamaza's testimony, defendant explained he was delivering controlled substances when the man approached him and attacked him, cutting defendant's finger. Defendant bragged that he had run over the individual several times to make certain that he was dead.

Prosecution witness Erik Eastman testified that in 1996, when he and defendant were prisoners at Santa Rita Jail, defendant struck him twice without provocation.

White's mother, Sondra Filson, testified concerning the impact of White's death on her. She also described the traumatic effect of the crimes on Tara and Tara's sister, Amanda.

### 2. *Defense evidence*

Defendant's half brother, Steve Martinez, testified regarding the harsh treatment received by defendant at the hands of their mother when they were children. He recounted episodes of physical abuse inflicted on defendant by his mother. Defendant's half brother and his sister, Jessica Marie Hutchinson, testified that defendant's mother always blamed defendant for a brain aneurysm that substantially disabled defendant's father when defendant was 14 years of age. According to these witnesses, defendant's mother believed an incident in which defendant accidentally struck his father's head while closing a garage door was the cause of the aneurysm that occurred months later.

## II.

## DISCUSSION

### A. Marsden *Inquiry*

Defendant contends the trial court erred (1) in failing to conduct a *Marsden* hearing (*People v. Marsden* (1970) 2 Cal.3d 118 [84 Cal.Rptr. 156, 465 P.2d 44]); (2) in discussing complaints concerning defense counsel's representation with counsel in defendant's absence; and (3) in failing to intervene to ensure that defense counsel responded adequately to complaints concerning his legal representation of defendant. Defendant claims these errors violated his state and federal constitutional rights to due process of law and a fair trial, to reliable guilt and penalty determinations, and to be personally present at all critical stages of the proceedings. We are not persuaded.

#### 1. *Factual background*

When a complaint was filed on December 26, 1990, the Alameda County Public Defender was appointed to represent defendant. Counsel from that office represented defendant during his 1991 preliminary hearing and subsequently filed a motion to suppress evidence. On February 1, 1994, prior to the hearing on the motion to suppress, the office declared a conflict of interest and Attorney Lincoln Mintz was appointed. Jury selection commenced on March 18, 1997, and the jury was sworn on May 5, 1997.

Defendant's sister, Jessica Marie Hutchinson, wrote four letters to the Superior Court of Alameda County during March, April, and May of 1995, approximately two years prior to the commencement of the trial. These letters complained that Mintz had failed to communicate adequately with defendant subsequent to the attorney's initial interview with his client.

The first letter, dated March 28, 1995, addressed to the court administrator, asserted that Hutchinson was writing "on behalf of [her] brother," and stated, "we are requesting" that defendant be transported to court for the next trial-setting hearing, then scheduled for April 4, 1995. The letter acknowledged that, ordinarily, such requests are made by counsel, but explained that defendant had been unable to communicate in person or by telephone with his attorney for a full year despite defendant's efforts to arrange a visit. The letter referred to denial of the "right to an adequate defense" and concluded: "[Defendant] is asking for what he is entitled to and what Mr. Mintz was appointed to give him—a defense. He is asking for a candid, face-to-face discussion with his attorney. Mr. Mintz has excellent recommendations and appears to be supremely qualified and well-respected. However, we are all

extremely frustrated with this situation and the lack of interest displayed by Mr. Mintz. We ask that all this be taken into consideration when deciding this basic request to appear in court."

The second letter was dated April 4, 1995, and, like the remaining two letters, was addressed to the Honorable William McGuiness. The letter repeated the earlier letter's description of defendant's unsuccessful efforts to contact Mintz personally or by telephone. It requested defendant's presence at the next trial-setting hearing and added that "[a]n acknowledgement and recognition of this problem and/or any other helpful information, conveyed to my brother, would be greatly appreciated."

The third letter was dated April 26, 1995, and stated Hutchinson was communicating "regarding her brother." The letter noted that no response to the previous letter had been received, but stated the expectation that any response from the court would be made "to [defendant] personally." The letter again asserted defendant had experienced "numerous difficulties" communicating with Mintz. It continued: "I do not believe [defendant] wants to change his attorney further delaying the proceedings. However, you must understand his intense frustration and ours as we have no legal advisor or access to the system at this current time. Not everyone enjoys the privileges of O.J. Simpson, but, regardless, [defendant] is entitled to legal representation. If Mr. Mintz is not willing or able to give this to him, it is the very least his obligation to let [defendant] know about it. We respectfully ask you to intervene, in an appropriate manner, and facilitate some communication between Mr. Mintz and [defendant]. [¶] I apologize for this ordeal which should not involve you. However, we are not sure of where to turn either and can not see any reason for what seems to be a continual neglect of [defendant]."

The fourth letter was dated May 10, 1995, and again was characterized as a communication "regarding" defendant. Defendant's sister requested "some kind of acknowledgement" from the court. It noted that "to my knowledge, Mr. Mintz has still not consulted with [defendant] at all about his case," and asserted that "[defendant] would simply like to meet and consult with Mr. Mintz prior to going to trial. If it takes judicial intervention to do so, then that is what he is asking."

On June 1, 1995, Judge McGuiness conducted a trial-setting proceeding. Defense counsel waived defendant's right to be present at the hearing. The clerk of the court noted in the record that the "[c]ourt further notes receiving correspondence from Jessica [Hutchinson]. [Counsel] receives copies of said correspondence and states he has ongoing contact with client and will contact family [with] future dates."

The reporter's transcript of the hearing reflects the following interchange.

"The Court: I would note parenthetically, for the record, the court received communications on May [10] and April 26 from a Jessica [Hutchinson], directed to the court. [¶] I have shared that correspondence, providing a copy with respect to those letters to Mr. Mintz. [¶] Mr. Mintz, did you want to state anything on the record with regard to that?

"[Defense counsel]: Just briefly. [¶] [Defendant] and I are in communication, your honor, contrary to what concerned members of his family have said. [¶] The Court, [defendant] and I have discussed the defense in this case. And what I will do is, previous to the July 13th [trial-setting] date, I will take up the matter of these with [defendant] and his family, and see that the court receives a communication, and close up the matter."

Defendant asserts that there was no further discussion of the matter on the record.

### 2. *Discussion*

Defendant contends the letters sent by his sister imposed a duty upon the court to order that he be transported to the court for a hearing at which the court could inquire into the adequacy of the legal representation provided to defendant by Mintz. Defendant places primary reliance upon this court's decision in *People v. Marsden, supra,* 2 Cal.3d 118 *(Marsden).* In that case, the defendant complained in general terms that his appointed counsel was not providing adequate representation, and the court inferred that he wished to discharge counsel and substitute another appointed attorney. The court conducted a hearing, but erred by refusing to permit defendant to list particular instances in which he felt his counsel had performed inadequately. *(Id.* at p. 124.)

In *Marsden, supra,* 2 Cal.3d 118, we explained that although an indigent defendant possesses a right under the Sixth Amendment to the assistance of court-appointed counsel, he or she does not have an unlimited right to require the trial court to discharge appointed counsel and appoint substitute counsel. *(Marsden,* at p. 123.) The decision whether to substitute counsel at the defendant's request rests within the trial court's discretion; when ineffective assistance of counsel is alleged by the defendant, the court should grant a request to substitute counsel if there is " ' "a sufficient showing . . . that the right to the assistance of counsel would be substantially impaired . . . in case the request is not granted . . . ." ' " *(Ibid.)*

In *Marsden, supra,* 2 Cal.3d 118, we pointed out that a trial court cannot discharge its duty without hearing the reasons for the defendant's belief that his or her attorney has not afforded adequate representation. *(Id.* at

pp. 123–124.) We observed that " 'the critical factual inquiry ordinarily relates to matters outside the trial record . . .' " (*id.* at p. 123), and concluded that denial of a motion to substitute counsel based upon the court's observations in the courtroom—without affording the defendant an opportunity to offer argument or evidence in support of his or her complaint—" 'is lacking in all the attributes of a judicial determination.' " (*Id.* at p. 124.)

We also rejected the position taken by the trial court in the *Marsden* case—that it was prohibited from advising the defendant how to present his request to substitute counsel. We pointed out that, on the contrary, we had commended courts that aided *unrepresented* persons " 'as to the presentation of evidence, the rules of substantive law, and legal procedure.' " (*Marsden, supra,* 2 Cal.3d at p. 126.) Even as to defendants who *are* represented, we concluded it is within the court's authority to assist a defendant who is "groping for the proper manner in which to demonstrate the alleged lack of competence of his attorney . . . ." (*Ibid.*)

a. *Absence of request to substitute counsel*

■ As a threshold matter, defendant's claim fails because a review of the record reveals that defendant did not complain concerning counsel, nor did he request substitution of counsel. Although a formal motion is not required, the trial court's duty to conduct an inquiry into the reasons the defendant believes his or her attorney is incompetent arises only when the defendant (or in some instances counsel) provides " 'at least some clear indication' " that the defendant wishes to substitute counsel. (*People v. Dickey* (2005) 35 Cal.4th 884, 920 [28 Cal.Rptr.3d 647, 111 P.3d 921]; see *People v. Valdez* (2004) 32 Cal.4th 73, 97 [8 Cal.Rptr.3d 271, 82 P.3d 296]; *People v. Mendoza* (2000) 24 Cal.4th 130, 157 [99 Cal.Rptr.2d 485, 6 P.3d 150].) Because defendant made no assertion whatsoever regarding dissatisfaction with counsel, the trial court's duty under *Marsden* was not triggered.

Moreover, contrary to defendant's contention, even if we were to view the letters sent by defendant's sister as emanating *from defendant*, those letters do not contain a "clear indication" from defendant that he desired substitution of counsel on the ground of counsel's deficiencies. In fact, as noted above, one of the letters states that "Mr. Mintz has excellent recommendations and appears to be supremely qualified and well-respected." The letters do not even imply a request to substitute counsel. Rather, they complain of lack of communication between defendant and his counsel, and request the court's intervention to improve attorney-client communication. In the absence of a request to *discharge* appointed counsel, however, differences of opinion between a defendant and his or her appointed counsel regarding the conduct

of the defense do not impose a duty upon the court to conduct a *Marsden* hearing. (*People v. Lucky* (1988) 45 Cal.3d 259, 281 [247 Cal.Rptr. 1, 753 P.2d 1052].)

> b. *Invocation of defendant's rights under* Marsden *by a third party*

In addition, the circumstance that the letters were sent by a third party renders them an insufficient basis for imposing a duty upon the court to conduct a *Marsden* hearing. This is so because our decision in *Marsden, supra,* 2 Cal.3d 118, was intended to afford protection to the defendant's right to counsel as guaranteed by the Sixth Amendment, and the constitutional right to counsel is personal to the *defendant* and ordinarily cannot be asserted vicariously. (*People v. Badgett* (1995) 10 Cal.4th 330, 343–344 [41 Cal.Rptr.2d 635, 895 P.2d 877]; see also *People v. Tena* (2007) 156 Cal.App.4th 598, 613 [67 Cal.Rptr.3d 412] [describing the personal nature of the right to present a defense, and to counsel].)[2]

It would be inappropriate to recognize a third party's authority to require the court to conduct a *Marsden* inquiry, because the defendant's right to mount a defense in the manner that he or she, under the direction of defense counsel, deems best requires that counsel's independence from third party influence be protected. The court must exercise circumspection in taking actions that may interfere with an existing attorney-client relationship, and must remain "on [its] guard neither to infringe upon the defendant's right to counsel of his choice, nor to compromise the independence of the bar." (*Smith v. Superior Court* (1968) 68 Cal.2d 547, 559 [68 Cal.Rptr. 1, 440 P.2d 65] ["The value in issue . . . is 'the state's duty to refrain from unreasonable interference with the individual's desire to defend himself in whatever manner he deems best, using every legitimate resource at his command.' "]; see *Cannon v. Commission on Judicial Qualifications* (1975) 14 Cal.3d 678, 697 [122 Cal.Rptr. 778, 537 P.2d 898]; see also *People v. Jones* (2004) 33 Cal.4th 234, 244 [14 Cal.Rptr.3d 579, 91 P.3d 939]; *Ingram v. Justice Court*

---

[2] We observe that persons who are not parties to litigation ordinarily cannot be heard in the litigation. In civil litigation a nonparty who has not formally intervened ordinarily cannot make a motion (*Difani v. Riverside County Oil Co.* (1927) 201 Cal. 210, 214 [256 P. 210]; *Marshank v. Superior Court* (1960) 180 Cal.App.2d 602, 605 [4 Cal.Rptr. 593]; see generally 6 Witkin, Cal. Procedure (5th ed. 2008) Proceedings Without Trial, § 4, p. 430.) The same generally is true in criminal cases. As we explained in *Dix v. Superior Court* (1991) 53 Cal.3d 442 [279 Cal.Rptr. 834, 807 P.2d 1063]: "*Except as specifically provided by law,* a private citizen has no personal legal interest in the outcome of an individual criminal prosecution against another person." (*Id.* at p. 451, italics added; see also 4 Witkin & Epstein, Cal. Criminal Law (3d ed. 2000) Introduction to Criminal Procedure, § 21, pp. 30–32; but see Cal. Const., art. I, § 28, amended by initiative, Gen. Elec. (Nov. 4, 2008) [commonly known as Prop. 9, affording certain rights to victims of crimes]; §§ 679.026, 1191.1–1191.2, 3041.5, 3043–3044 [also affording certain rights to victims of crime in some instances].)

(1968) 69 Cal.2d 832, 840 [73 Cal.Rptr. 410, 447 P.2d 650].) We would risk encouraging interference with the attorney-client relationship were we to hold that a trial court must conduct a *Marsden* hearing when a third party complains concerning the representation received by a defendant.[3]

Practical considerations support the conclusion we reach. A third party does not owe a duty of loyalty to the defendant, whereas a party's attorney owes the highest fiduciary duty to his or her client. (1 Witkin, Cal. Procedure, *supra*, Attorneys, § 90, pp. 125–127; *id.*, § 101, p. 138.) The intervention of a person who is not under such a duty could impair the defendant's interests, especially because third parties may have motives that are inimical to the defense position. And when the nonparty is not a lawyer, even a well-intentioned person adversely could impact the defendant's position because of ignorance of the law. (See *J. W. v. Superior Court* (1993) 17 Cal.App.4th 958, 969 [22 Cal.Rptr.2d 527].) In addition, because communication between attorney and client is confidential and privileged, third parties are unlikely to have complete information concerning the attorney-client relationship. Accordingly, third parties ordinarily lack a reliable basis upon which to allege ineffective assistance of counsel.

Finally, there is no necessity to impose a duty upon the court to entertain *Marsden* motions made by third parties, because even incarcerated defendants can speak for themselves in various ways. There is no indication in the present record that defendant was unable to communicate with the court except through his sister. Defendant, like his sister, could have mailed a letter to the court. He also could have complained concerning the representation afforded to him at the first opportunity when he ultimately did appear in court.

■ For all these reasons, we perceive no cause to deviate from principles recognizing the personal nature of the right to counsel and protecting the attorney-client relationship from third party interference. We decline to impose upon the court a duty to conduct a hearing or respond to criticism of appointed counsel that has been levied by a nonparty.

---

[3] Defendant's claim that his sister acted as his agent does not assist his position. Even lawyers may not appear on behalf of persons who are represented by other attorneys. (1A Cal.Jur.3d (2006 ed.) Actions, § 130, p. 179; see also Rules Prof. Conduct, rule 2-100(A); 1 Witkin, Cal. Procedure, *supra*, Attorneys, § 422, p. 536.) Indeed, with limited exceptions— including the one developed in our *Marsden* decision—the client himself or herself must be heard in court through his or her counsel. (*People v. Masterson* (1994) 8 Cal.4th 965, 969 [35 Cal.Rptr.2d 679, 884 P.2d 136]; 1 Witkin, Cal. Procedure, *supra*, Attorneys, § 239, p. 312; *id.*, § 243, p. 316; see also *People v. Carpenter* (1997) 15 Cal.4th 312, 376 [63 Cal.Rptr.2d 1, 935 P.2d 708], superseded by statute on other grounds as recognized in *Verdin v. Superior Court* (2008) 43 Cal.4th 1096, 1106–1107 [77 Cal.Rptr.3d 287, 183 P.3d 1250].) In light of this circumstance, it would be anomalous to conclude that applications made by a stranger to the litigation nonetheless must be considered and acted upon by the court.

c. *Asserted obligation to intervene on the court's own motion*

Defendant contends that trial courts are under an obligation to protect the defendant's right to effective assistance of counsel through inquiry initiated in the first instance by the court, once the court knows or should know that the adequacy of counsel's representation is in question. Defendant claims the court, at the least, should have "acknowledged" his sister's letters, permitted defendant to appear before the court, and "follow[ed] up on Mr. Mintz's promise to furnish the court with a 'communication' to 'close up the matter.' " To the extent defendant claims the court is under an obligation to conduct a *Marsden* inquiry on its own motion, we are not persuaded. On the contrary, as suggested by the many decisions of this court requiring some indication *from the defendant* (or defense counsel) (see *People v. Carter* (2005) 36 Cal.4th 1114, 1194 [32 Cal.Rptr.3d 759, 117 P.3d 476]) that *the defendant* wishes to substitute counsel (*People v. Valdez, supra,* 32 Cal.4th at p. 96; *People v. Dickey, supra,* 35 Cal.4th at pp. 920–921), we agree with the decisions of the Courts of Appeal holding specifically that the trial court is not required to conduct a *Marsden* hearing on its own motion. (*People v. Lara* (2001) 86 Cal.App.4th 139, 150 [103 Cal.Rptr.2d 201]; *People v. Leonard* (2000) 78 Cal.App.4th 776, 787 [93 Cal.Rptr.2d 180]; *People v. Gay* (1990) 221 Cal.App.3d 1065, 1070 [270 Cal.Rptr. 747]; see also *People v. Montiel* (1993) 5 Cal.4th 877, 906 [21 Cal.Rptr.2d 705, 855 P.2d 1277].)

To the extent defendant's claim is based upon an asserted general duty on the part of the trial court to supervise appointed counsel, any obligation that may rest upon the court to uphold a proper standard of representation by appointed counsel (see *McMann v. Richardson* (1970) 397 U.S. 759, 771 [25 L.Ed.2d 763, 90 S.Ct. 1441]; *People v. McKenzie* (1983) 34 Cal.3d 616, 630 [194 Cal.Rptr. 462, 668 P.2d 769], disapproved on another point in *People v. Crayton* (2002) 28 Cal.4th 346, 364–365 [121 Cal.Rptr.2d 580, 48 P.3d 1136]) is circumscribed and must be understood in light of the countervailing duty of the court to respect the inviolability of the attorney-client relationship and to permit the defendant to present his or her defense in the manner deemed appropriate by counsel in consultation with the defendant. (See *Smith v. Superior Court, supra,* 68 Cal.2d at pp. 559–561; see also *People v. Jones, supra,* 33 Cal.4th at pp. 242–244.) Thus, the trial court's authority to discharge an appointed attorney for misconduct or incompetence on its own motion is limited. (See *People v. Jones, supra,* 33 Cal.4th at p. 243, citing *Cannon v. Commission on Judicial Qualifications, supra,* 14 Cal.3d at p. 697.)

In any event, whatever may be the obligation of a court to initiate a hearing when the *defendant* complains to the court concerning appointed counsel's

performance, or when the court, in person, has *observed* an attorney's apparent disregard for his or her client's interests, no such obligation falls upon a court simply because a third party has suggested that appointed counsel—long before the commencement of trial—has neglected a client who is equally capable of lodging such a complaint.[4]

We also acknowledge that the trial court does bear a duty of inquiry on its own motion when it knows or should know of a potential conflict of interest between a defendant and his or her counsel. Specifically, "[w]hen a court ' "knows or reasonably should know that a particular conflict exists," ' it should inquire into the conflict even in the absence of objection by the defendant or his or her counsel." (*People v. Cornwell* (2005) 37 Cal.4th 50, 75 [33 Cal.Rptr.3d 1, 117 P.3d 622], disapproved on another point in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22 [87 Cal.Rptr.3d 209, 198 P.3d 11]; see also *People v. Rundle* (2008) 43 Cal.4th 76, 176 [74 Cal.Rptr.3d 454, 180 P.3d 224], disapproved on another point in *People v. Doolin, supra,* 45 Cal.4th at p. 421, fn. 22.) Nonetheless, "the duty to inquire is not triggered merely because of 'a vague, unspecified possibility of conflict.' " (*People v. Cornwell,* at p. 75 [noting that not every instance of an attorney's representation of multiple defendants charged with the same crime gives rise to a duty of inquiry].) But, as with defendant's doubtful assertion that the court has a general obligation to supervise counsel to ensure adequate representation, even assuming some such limited duty under certain circumstances, the cited decisions fall far short of suggesting a duty to initiate a hearing whenever the court receives any indication, even one made by a *third party,* that appointed counsel has failed to communicate adequately with the defendant—a complaint that, by itself, ordinarily is not a sufficient basis to require a court to grant even the *defendant's* own request to substitute counsel. (See *People v. Cole* (2004) 33 Cal.4th 1158, 1192 [17 Cal.Rptr.3d 532, 95 P.3d 811].)

Defendant asserts that the special need for reliability existing in capital trials requires courts to conduct an inquiry or take some further action to ensure diligent and competent assistance of appointed counsel under circumstances such as occurred in the present case. Indeed, as defendant

---

[4] Defendant suggests that if the court was not inclined to assist defendant in formulating a *Marsden* motion, it should have appointed independent advisory counsel to represent him "on the issue of whether he was receiving the effective assistance of counsel . . . ." We have rejected the same claim in a prior decision. (*People v. Hines* (1997) 15 Cal.4th 997, 1024–1025 [64 Cal.Rptr.2d 594, 938 P.2d 388].)

Defendant also relies upon a federal decision declaring that "to compel one charged with [a] grievous crime to undergo a trial with the assistance of an attorney with whom he has become embroiled in irreconcilable conflict is to deprive him of the effective assistance of any counsel whatsoever." (*Brown v. Craven* (9th Cir. 1970) 424 F.2d 1166, 1170.) Because the defendant in that case had complained concerning his attorney and requested substitute counsel on four occasions, ultimately refusing entirely to cooperate at trial, that case is clearly distinguishable.

contends, high court decisions state as a general proposition that the Eighth and Fourteenth Amendments to the United States Constitution prescribe heightened reliability for proceedings in capital cases. (See *Zant v. Stephens* (1983) 462 U.S. 862, 874–879 [77 L.Ed.2d 235, 103 S.Ct. 2733]; *Beck v. Alabama* (1980) 447 U.S. 625, 637–638 [65 L.Ed.2d 392, 100 S.Ct. 2382].) Defendant offers no authority, however, supporting the view that this general rule requires trial courts to intervene in the attorney-client relationship on the basis of complaints concerning attorney-client communication brought by third parties.[5]

### d. Asserted error in conducting hearing in defendant's absence

Defendant contends his rights to counsel and to be present at critical stages of the proceedings were violated when the trial court conducted the trial-setting hearing on June 1, 1995, and discussed defendant's sister's letters with counsel, but failed to order that defendant be brought to court for the hearing. He contends that his attorney failed to represent him at the hearing, leaving him "totally without representation at a crucial hearing."

■ Indeed, trial courts ordinarily should not enter into a discussion of a defendant's *Marsden* motion with defense counsel when the defendant is absent. (*People v. Hill, supra,* 148 Cal.App.3d at p. 755; 5 Witkin & Epstein, Cal. Criminal Law, *supra,* Criminal Trial, § 222, p. 347; see also *People v. Perry* (2006) 38 Cal.4th 302, 313 [42 Cal.Rptr.3d 30, 132 P.3d 235] ["We do not dispute that a defendant may be entitled to be present at a conference called to consider whether to remove his counsel for conflict of interest or any other reason, because the removal of counsel will affect the defendant's

---

[5] Defendant seeks to bolster his claim by pointing to counsel's conduct throughout the trial, but the trial court's actions ordinarily must be reviewed on the basis of the evidence before it at the time it made its decision concerning such a complaint. (See *People v. Berryman* (1993) 6 Cal.4th 1048, 1070 [25 Cal.Rptr.2d 867, 864 P.2d 40], disapproved on other grounds in *People v. Hill* (1998) 17 Cal.4th 800, 823, fn. 1 [72 Cal.Rptr.2d 656, 952 P.2d 673].) The decisions of the trial court cannot be reviewed on the basis of the subsequent conduct of counsel. Defendant's claim that the court should have "followed up on" his sister's complaints ignores the circumstance that the court was not under an obligation to respond to complaints made by third parties. In addition, defendant's reference to his attorney's conduct of the trial principally is offered in support of his claim that any error on the part of the court in failing to conduct a hearing on the basis of his sister's letters was *prejudicial,* but we have concluded there was no error, obviating the need to inquire into prejudice. Finally, although we have taken judicial notice of certain records of professional discipline imposed on Mintz, including disbarment subsequent to the trial in the present case (see Evid. Code, § 452), these records are not relevant to defendant's claim. (See *People v. Hill* (1983) 148 Cal.App.3d 744, 755 [196 Cal.Rptr. 382] ["a court may not go outside the record of the immediate prosecution and base the disposition of [the] defendant's [*Marsden* motion] upon observations of the attorney on other occasions"].) There is no indication that the court was aware of misconduct by Mintz toward his other clients.

representation at trial, and is a matter on which the defendant's views should be heard."].) Defendant's trial-setting hearing, however, did not constitute a hearing on a *Marsden* motion, and the court did not consider at the trial-setting hearing whether to substitute counsel.

■ With respect to defendant's claim that he had a right to be present at the trial-setting hearing, "[u]nder the Sixth Amendment's confrontation clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless his appearance is necessary to prevent 'interference with [his] opportunity for effective cross-examination.' [Citations.] [¶] Similarly, under the Fourteenth Amendment's due process clause, a criminal defendant does not have a right to be personally present at a particular proceeding unless he finds himself at a 'stage . . . that is critical to [the] outcome' and 'his presence would contribute to the fairness of the procedure.' [Citation.]" (*People v. Waidla* (2000) 22 Cal.4th 690, 741–742 [94 Cal.Rptr.2d 396, 996 P.2d 46].)

We need not discuss the boundaries of defendant's right to be present at pretrial hearings, or whether defendant effectively waived his presence at the trial-setting hearing, however, because any error in failing to secure his presence was harmless beyond a reasonable doubt. (See *Rushen v. Spain* (1983) 464 U.S. 114, 117–118, fn. 2 [78 L.Ed.2d 267, 104 S.Ct. 453]; see also *Campbell v. Rice* (9th Cir. 2005) 408 F.3d 1166, 1172–1173; *People v. Romero* (2008) 44 Cal.4th 386, 419 [79 Cal.Rptr.3d 334, 187 P.3d 56]; *People v. Ayala* (2000) 24 Cal.4th 243, 268–269 [99 Cal.Rptr.2d 532, 6 P.3d 193]; *People v. Bradford* (1997) 15 Cal.4th 1229, 1357 [65 Cal.Rptr.2d 145, 939 P.2d 259]; *People v. Wright* (1990) 52 Cal.3d 367, 403 [276 Cal.Rptr. 731, 802 P.2d 221].) As noted, the court did not conduct a *Marsden* hearing or reach any decision at the trial-setting hearing of June 1, 1995; the court did not interpose any obstacle to defendant's expressing dissatisfaction with Mintz by letter or at a later hearing actually attended by defendant;[6] and the proceedings of which defendant complains occurred approximately two years prior to the commencement of the trial, leaving him multiple subsequent opportunities to express—for himself—any reservations he entertained concerning his defense counsel.

### B. *Exclusion of Prospective Jurors for Cause*

Defendant contends the trial court improperly sustained the prosecutor's challenges for cause against two prospective jurors, in violation of his state and federal constitutional rights to due process of law, a fair and impartial

---

[6] As defendant acknowledges, he was personally present at a pretrial hearing conducted on August 9, 1996, and at subsequent hearings and at all portions of the trial, which commenced in March 1997.

jury, and a reliable penalty verdict. (U.S. Const., 5th, 6th, 8th & 14th Amends.; Cal. Const., art. I, §§ 7, 15, 16 & 17.) He contends these two prospective jurors did not express views concerning capital punishment that warranted their exclusion from the jury, that the trial court employed an incorrect standard in making its ruling, and that the court displayed bias against prospective jurors who had reservations concerning the death penalty.[7] As we shall explain, we conclude the trial court did not abuse its discretion and did not apply an incorrect standard or display bias.

### 1. *Governing principles*

The state and federal Constitutions guarantee a criminal defendant the right to a trial by an impartial jury. (*Wainwright v. Witt* (1985) 469 U.S. 412, 424 [83 L.Ed.2d 841, 105 S.Ct. 844] (*Witt*); *People v. Wilson* (2008) 44 Cal.4th 758, 778 [80 Cal.Rptr.3d 211, 187 P.3d 1041].) Decisions of the United States Supreme Court and of this court make it clear that a prospective juror's personal views concerning the death penalty do not necessarily afford a basis for excusing the juror for bias. As the high court observed, because " '[a] man who opposes the death penalty, no less than one who favors it, can make the discretionary judgment entrusted to him by the State . . . ,' " it follows that " 'a sentence of death cannot be carried out if the jury that imposed or recommended it was chosen by excluding veniremen for cause simply because they voiced general objections to the death penalty . . . .' " (*Uttecht v. Brown* (2007) 551 U.S. 1, 6 [167 L.Ed.2d 1014, 127 S.Ct. 2218].)

Rather, when a juror is challenged for cause because of his or her views concerning capital punishment, the trial court must apply the following standard: "To achieve the constitutional imperative of impartiality, the law permits a prospective juror to be challenged for cause only if his or her views in favor of or against capital punishment 'would "prevent or substantially impair the performance of his [or her] duties as a juror" ' in accordance with the court's instructions and the juror's oath." (*People v. Blair* (2005) 36 Cal.4th 686, 741 [31 Cal.Rptr.3d 485, 115 P.3d 1145], quoting *Witt, supra,* 469 U.S. at p. 424.)

As we have explained in many decisions, " ' "[t]here is no requirement that a prospective juror's bias against the death penalty be proven with unmistakable clarity. [Citations.] Rather, it is sufficient that the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law in the case before the juror." ' " (*People v. Abilez* (2007) 41 Cal.4th 472, 497–498 [61 Cal.Rptr.3d 526, 161 P.3d 58].)

---

[7] Defendant claims that error in this regard would require reversal not only of the penalty phase judgment but also of the guilt phase judgment. This claim lacks merit. (*People v. Heard* (2003) 31 Cal.4th 946, 966 [4 Cal.Rptr.3d 131, 75 P.3d 53].)

The trial court's determination is reviewed for abuse of discretion. (*People v. Abilez, supra*, 41 Cal.4th at pp. 497–498.) Reviewing courts defer to the trial court on the essentially factual question of the prospective juror's true state of mind. (*People v. Lewis* (2008) 43 Cal.4th 415, 483 [75 Cal.Rptr.3d 588, 181 P.3d 947].) Indeed, "the [trial court's] finding may be upheld even in the absence of clear statements from the juror that he or she is impaired because 'many veniremen simply cannot be asked enough questions to reach the point where their bias has been made "unmistakably clear"; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings.' [Citation.] Thus, when there is ambiguity in the prospective juror's statements, 'the trial court, aided as it undoubtedly [is] by its assessment of [the venireman's] demeanor, [is] entitled to resolve it in favor of the State.' " (*Uttecht v. Brown, supra*, 551 U.S. at p. 7.) In sum, even when " '[t]he precise wording of the question asked of [the venireman], and the answer he gave, do not by themselves compel the conclusion that he could not under any circumstance recommend the death penalty,' the need to defer to the trial court remains because so much may turn on a potential juror's demeanor." (*Id.* at p. 8.)

The deference owed to the trial court's determination bears emphasis. As explained in a recent decision by the United States Supreme Court, "[d]eference to the trial court is appropriate because it is in a position to assess the demeanor of the venire, and of the individuals who compose it, a factor of critical importance in assessing the attitude and qualifications of potential jurors." (*Uttecht v. Brown, supra*, 551 U.S. at p. 9.) The trial court's determination whether a prospective juror entertains disqualifying bias " 'is based upon determinations of demeanor and credibility that are peculiarly within a trial judge's province.' " (*Id.* at p. 7.)

Our own decisions are in accord: "[A]ppellate courts recognize that a trial judge who observes and speaks with a prospective juror and hears that person's responses (noting, among other things, the person's tone of voice, apparent level of confidence, and demeanor), gleans valuable information that simply does not appear on the record." (*People v. Stewart* (2004) 33 Cal.4th 425, 451 [15 Cal.Rptr.3d 656, 93 P.3d 271].)

Jurors commonly supply conflicting or equivocal responses to questions directed at their potential bias or incapacity to serve. When such conflicting or equivocal answers are given, the trial court, through its observation of the juror's demeanor as well as through its evaluation of the juror's verbal responses, is best suited to reach a conclusion regarding the juror's actual state of mind (*People v. Hamilton* (2009) 45 Cal.4th 863, 890 [89 Cal.Rptr.3d 286, 200 P.3d 898]), and its determination " ' "as to [the juror's] true state of

mind is *binding* on an appellate court" ' " (*People v. Boyette* (2002) 29 Cal.4th 381, 416 [127 Cal.Rptr.2d 544, 58 P.3d 391], italics added). The trial court's resolution of conflicts on the question of juror bias is binding on the reviewing court if supported by substantial evidence. (*People v. Hamilton, supra,* 45 Cal.4th at p. 890.)

 In applying these precepts, however, we must keep in mind that a prospective juror who is firmly opposed to the death penalty is not disqualified from serving on a capital jury. "[N]ot all who oppose the death penalty are subject to removal for cause in capital cases; those who firmly believe that the death penalty is unjust may nevertheless serve as jurors in capital cases so long as they state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree* (1986) 476 U.S. 162, 176 [90 L.Ed.2d 137, 106 S.Ct. 1758]; see *People v. Stewart, supra,* 33 Cal.4th at p. 446.) As this court has stated, "a prospective juror's personal conscientious objection to the death penalty is not a sufficient basis for excluding that person from jury service in a capital case . . . . ' . . . The real question is whether the juror's attitude will " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " . . . A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict.' " (*People v. Stewart, supra,* 33 Cal.4th at p. 446, citations & italics omitted; see *People v. Kaurish* (1990) 52 Cal.3d 648, 699 [276 Cal.Rptr. 788, 802 P.2d 278].)

### 2. *Discussion*

#### a. *Prospective Juror B.S.*

In her questionnaire, Prospective Juror B.S. stated she was "strongly against" the death penalty, but she also checked a box indicating she did not "hold any religious, moral feelings or philosophical principles that would affect [her] ability to vote for the death penalty in this case." She repeated that she was "strongly against" the death penalty and would vote against a ballot measure authorizing capital punishment, explaining that she believed such punishment "serves no useful purpose; makes killers out of us." At the same time, she added that she could "see some circumstances where society would have to put an end to someone's life."

During voir dire, the court explained to Prospective Juror B.S. that it would determine whether prospective jurors would "truly have an open mind to both penalty choices," permitting them to "realistically and practically, not as a

matter of theory, . . . seriously consider imposing either . . . the death penalty or life in prison without possibility of parole." The court inquired: "What's your . . . bottom line judgment here on yourself? You have some very strong views you expressed in your questionnaire. Do you think as a practical realistic matter both of these penalty alternatives are really available to you?"

B.S. responded: "I have some very strong views against the death penalty. And I feel I could listen to the evidence and make a determination based on the evidence. It's not something that I would look forward to doing, but I feel I could do it."

When the trial court noted that Prospective Juror B.S. "generally opposed the death penalty," she corrected the court, stating, "I would change that to strongly" in lieu of "generally." The court referred to her stated view that capital punishment serves no useful purpose and "makes everyone a killer," but that there might be circumstances in which "society would have to put an end to someone's life." The court commented: "Now bear in mind the decision the jury would be asked to make here is not a decision by society, it's a decision that you personally would have to make. So my question [is] do you . . . realistically and practically feel that you could ever vote for the death penalty, you yourself personally vote for the death penalty?" B.S. responded: "I think I probably could if the evidence warranted it. I would not do so lightly. And I would be more inclined not to."

As defendant points out, in spite of her philosophical views Prospective Juror B.S. did assert on several occasions that she could impose a sentence of death. When the prosecutor asked whether there was a realistic possibility she could "vote to end [defendant's] life," B.S. responded that "I'd [say] that I could do it if I had to do it." Her explanation introduced some ambiguity into her response, however: "Even though I am philosophically opposed to the death—I'm strongly opposed to the death penalty—I also have thought long and hard about this during these last weeks and I would rather have me on a jury than somebody who has no opinion or somebody who is vociferously for the death penalty."

When the prosecutor inquired as to which circumstances might lead her to vote for the death penalty despite her belief the penalty "makes killers out of us," she referred to "particularly heinous" crimes, to recidivists, "or if it seemed like this is the kind of person he was before this time as well, I'm just kind of talking off the top of my head, I don't know. I really have to . . . hear the evidence, hear the facts . . . ."

The prosecutor commented that some persons might be unable to impose the death penalty for crimes such as those charged against defendant, that is

for a murder in the course of a child molestation. The prosecutor continued: "Just knowing yourself . . . and the fact that you feel that the death penalty serves no purpose other than making killers out of us all, . . . is it realistic that you would vote for the death penalty in this case that we have here?"

B.S. responded: "It is not realistic that I would, but it is realistic that I can, that I could. I'm sorry, I'm a writer."

When the prosecutor asked her to elaborate, she responded: "Well, I don't think I can say more about it than I already have. I take this seriously. There is a possibility that I could vote for the death penalty. I would have to have all the evidence, all the facts, and it would have to be something that would push me beyond the way I normally feel about the death penalty. But . . . that could happen."

The prosecutor pursued the point made by the prospective juror that she could vote in favor of the death penalty only if something "pushed her beyond" her established views, asking whether she meant that although it was possible that certain evidence could cause her to vote for the death penalty, it was not "realistic" that she would. B.S. parried this question with the comment that she believed the prosecutor was "trying to get [her] to say that [she] would never vote for the death penalty." The prosecutor explained that a person who automatically would reject the death penalty would not afford the People a fair trial. He asked: "[I]s this an appropriate case for you as far as the nature of this case [and] the imposition of the death penalty . . . given what you have written in your questionnaire?"

B.S. responded: "I think I can hear the evidence and I think I can make a good decision according to the law. I am not looking to be on this jury. I don't especially want to, but if I am chosen for the jury I think I would make a good decision."

The prosecutor challenged Prospective Juror B.S. for cause. In the prosecutor's view, B.S. had "engage[d] in verbal gymnastics," was evasive, and lacked candor. By contrast, defense counsel opposed the challenge and argued that a juror who is strongly opposed to the death penalty and would be disinclined to reach a verdict of death nonetheless may serve on a jury if his or her ability to follow the law is not impaired.

In making its determination, the trial court commented that B.S. held the strongest views opposing the death penalty of any of the prospective jurors who had been questioned, and that "no one ha[s] articulated with such a precise and devastating impact the depth of her feeling against capital punishment wherein she brands anyone who would impose capital punishment a killer." Referring to the prosecutor's question whether it was realistic

to suppose B.S. would vote for a sentence of death, the court commented that her initial statement in response to the prosecutor—that "[i]t is not realistic that I would" impose a sentence of death—rendered the second part of her answer—"it is realistic that I . . . could"—"essentially irrelevant. . . . *I think what she's telling me* in the context of all the statements she's made here, especially in the statement in the questionnaire . . . *is that she would never vote for the death penalty under any circumstances.*" (Italics added.) The court expressed "a definite impression that she would be unable to fulfill and impartially apply the law," and "a definite impression based on her questionnaire and based on what she said here in court that her views are such that [they] would prevent or substantial[ly] impair her performance [of her] duties in accordance with . . . instructions [and] . . . her oath. . . .' "

The trial court's impression of the prospective juror's true state of mind is entitled to deference under the circumstances apparent in the present case. This court has considered the extensive transcript documenting the voir dire of B.S. The trial court "supervised a diligent and thoughtful *voir dire*" (*Uttecht v. Brown, supra,* 555 U.S. at p. 20), taking pains to state and apply the correct standard and to explain the overall impression it received from the entire voir dire of B.S. As required by our decisions, the court "engage[d] in a conscientious attempt to determine [this] prospective juror's views regarding capital punishment . . . ." (*People v. Wilson, supra,* 44 Cal.4th at p. 779.) Although the juror declared a theoretical possibility that she could vote for the penalty of death, the court legitimately could infer from the strength of the juror's views, her verbal fencing with the prosecutor, and her equivocal statements, that she was substantially impaired in her ability to perform her duties as a juror.

Defendant claims that deference to the trial court is unwarranted because, in his view, the prospective juror did not equivocate on any significant point during her voir dire. We disagree. She equivocated when the trial court inquired whether she "realistically and practically" believed she could "personally vote for the death penalty," to which she replied, "I *think* I *probably* could *if* the evidence warranted it." (Italics added.) It appeared she proposed to hold to her views unless something "push[ed] [her] beyond the way [she] normally [felt] about the death penalty." Finally, when the prosecutor legitimately inquired whether it was realistic to suppose she would vote in favor of the penalty of death for a murder committed in connection with a child molestation (see *People v. Hill* (1992) 3 Cal.4th 959, 1003 [13 Cal.Rptr.2d 475, 839 P.2d 984], disapproved on another point in *Price v. Superior Court* (2001) 25 Cal.4th 1046, 1069, fn. 13 [108 Cal.Rptr.2d 409, 25 P.3d 618]; *People v. Pinholster* (1992) 1 Cal.4th 865, 917–918 [4 Cal.Rptr.2d 765, 824 P.2d 571]), her response—that it was "not realistic that I *would,* but it is realistic that I *can,* that I *could*" impose the death penalty (italics added)— appeared to the court in the context of the questioning to be "verbal

gymnastics," as the prosecutor alleged, rather than an exercise in grammar, as defendant claims. (See *People v. DePriest* (2007) 42 Cal.4th 1, 21 [63 Cal.Rptr.3d 896, 163 P.3d 896] [noting the significance of a prospective juror's avoidance of the prosecutor's questions].) The trial court explained that the response persuaded it that B.S.'s actual state of mind was such that there was no realistic possibility she ever would vote in favor of a penalty of death. (The court evidently paid attention to the demeanor of prospective jurors throughout the voir dire, stating later in the proceedings that "I'm very sensitive to . . . such things as body language, unspoken pauses . . . ." (See p. 444, *post*; see also pp. 442–443, *post*.)) The court's determination concerning the prospective juror's true state of mind is entitled to deference.

█ Defendant objects to the trial court's reliance upon the strength of the prospective juror's opposition to the death penalty. As defendant urges, jurors who are firmly opposed to the death penalty are qualified to serve if they "state clearly that they are willing to temporarily set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree, supra*, 476 U.S. at p. 176; see also *People v. Wilson, supra*, 44 Cal.4th at pp. 785–786.) Prospective Juror B.S. did not make such a statement, however. Indeed, she said on five occasions that she was "strongly" or "very strongly" opposed to the death penalty, and confirmed that she believed "philosophically" that capital punishment "serves no useful purpose" and "makes killers out of us." In the absence of a clear indication that she was willing to set aside those views and apply the law, the trial court legitimately took into account her insistent, repeated, and forcefully worded references to her strong opposition to the death penalty when it considered the equivocal nature of some of her responses. (See *People v. Hamilton, supra*, 45 Cal.4th at p. 891 [trial court referred to the excused juror as " 'a man of pretty strong convictions' " who did not wish to appear closed-minded but who would, in actuality, always vote against the penalty of death]; *People v. Avila* (2006) 38 Cal.4th 491, 531 [43 Cal.Rptr.3d 1, 133 P.3d 1076] [referring to jurors' having disclosed views against the death penalty "so strong as to disqualify them for duty on a death penalty case"]; see also *U.S. v. Fell* (2d Cir. 2008) 531 F.3d 197, 213.)

Defendant also points to statements made by the prospective juror indicating she was not opposed to imposition of the death penalty in *every* case, contending these established her qualification to serve. The court legitimately could view these statements, however, as in tension with her view that a vote in favor of the penalty of death would serve no purpose and would render the prospective juror a killer. (See *People v. DePriest, supra*, 42 Cal.4th at pp. 21–22; see also *People v. Salcido* (2008) 44 Cal.4th 93, 133 [79 Cal.Rptr.3d 54, 186 P.3d 437].) When a prospective juror has made statements that tend to support the trial court's conclusion that the juror is not qualified, "[t]he fact that [the juror] also gave statements that might have warranted keeping [her] as [a juror] does not change [the] conclusion" that

substantial evidence supports the trial court's ruling. (*People v. Thornton* (2007) 41 Cal.4th 391, 414 [61 Cal.Rptr.3d 461, 161 P.3d 3].)

The trial court was justified in concluding that the prospective juror's responses, rather than suggesting she could set aside her own personal views, constituted merely a grudging acknowledgment that those views might include some narrow exception—or at least an abstract possibility she would consider the statutory penalty of death. But the mere theoretical possibility that a prospective juror might be able to reach a verdict of death in some case does not necessarily render the dismissal of the juror an abuse of discretion. (*People v. Wharton* (1991) 53 Cal.3d 522, 588–589 [280 Cal.Rptr. 631, 809 P.2d 290]; see also *People v. Lancaster* (2007) 41 Cal.4th 50, 80 [58 Cal.Rptr.3d 608, 158 P.3d 157].) Excusal for cause is not limited to a juror who " 'zealously opposes or supports the death penalty in every case.' " (*People v. Riggs* (2008) 44 Cal.4th 248, 282 [79 Cal.Rptr.3d 648, 187 P.3d 363].)

Defendant, objecting that the trial court employed an incorrect standard, asserts the court failed to understand that a person who is opposed to the death penalty nevertheless may be qualified to serve. Defendant contends the prospective juror's responses merely demonstrated she had a high threshold for imposing the death penalty—a circumstance we acknowledge does not necessarily mean the juror is substantially impaired within the meaning of *Witt*, *supra*, 469 U.S. 412. (*People v. Stewart*, *supra*, 33 Cal.4th at p. 447; *People v. Kaurish*, *supra*, 52 Cal.3d at p. 699.)

We are not persuaded. The court did not limit its inquiry to whether B.S. was opposed to the death penalty. Rather, the court correctly enunciated the *Witt* standard and inquired of B.S. and other prospective jurors whether there was a realistic, practical possibility the juror could consider either penalty option—a formulation we have concluded satisfies the standard set forth by the high court in *Witt*. (*People v. Mason* (1991) 52 Cal.3d 909, 954 [277 Cal.Rptr. 166, 802 P.2d 950]; see also *People v. Lancaster*, *supra*, 41 Cal.4th at p. 80.)

Defendant counters that the trial court must have employed an erroneous standard, because it believed B.S.'s views concerning capital punishment were "far stronger, far more compelling than any of the answers that the Supreme Court reviewed and upheld as constituting a valid challenge for cause" in *People v. Hill*, *supra*, 3 Cal.4th 959, whereas the jurors in that case stated they "probably" could not or "didn't think" they could, or "would feel uneasy about" imposing the death penalty. By contrast, defendant points out, B.S. affirmed that there was a possibility she could vote for the maximum penalty. Unlike B.S. in the present case, however, the prospective

jurors in the *Hill* case did not stress their strong opposition to the death penalty and did not state that the death penalty serves no purpose and "makes killers out of us" all—a view that cast doubt upon B.S.'s claim she could vote to impose the penalty of death in an appropriate case.

In sum, in the circumstances of the present case it is appropriate to defer to the trial court, which conducted a careful voir dire and was able to observe the prospective juror's demeanor. Substantial evidence supports the trial court's conclusion that Prospective Juror B.S. held views that would render her unable " 'realistically and honestly' " to give the prosecution " 'a fair hearing and a fair opportunity to at least persuade [her] to [vote for] the death penalty.' " (*People v. Hamilton, supra*, 45 Cal.4th at p. 891; see also *People v. DePriest, supra*, 42 Cal.4th at p. 22 [jurors properly excused who would experience "extreme difficulty imposing capital punishment, even in an appropriate case," and whose responses and demeanor produced a " 'definite impression that [their] views on the death penalty would substantially impair the performance of [their] duties' "].)

### b. *Prospective Juror E.H.*

In her response to the juror questionnaire, when asked to describe her general feelings regarding the death penalty, Prospective Juror E.H. wrote: "I used to be strictly against it—particularly because it was applied to poor or minority persons more so than others. Now—I might be able to vote for the death penalty—if a crime was really, really awful." She added that her views had moved from "strongly against" to "moderately against" capital punishment, "based on hearing of awful crimes and repeat offenders." Her questionnaire also noted that she would vote against a ballot measure authorizing the penalty of death, because "it's applied more often to minority and poor" defendants. She nonetheless checked the box on the questionnaire indicating that she did not "hold any religious, moral feelings or philosophical principle that would affect [her] ability to vote for the death penalty in this case."

During voir dire, the trial court inquired whether, in light of her views, both the punishment of death and the punishment of life in prison without the possibility of parole "are realistically available to you?" E.H. responded in the affirmative, explaining: "I just mean because there are the two choices, I'm more inclined to go for life [in prison] without [the possibility of parole], instead of the death penalty, but there could be situations where I could vote for the death penalty."

The court inquired whether in "the situations that you are contemplating, are they the kind of thing that you would call realistic and practical possibilities, or do you think they fall into the category of something that is

theoretically available but not really realistic, practical, common sense." E.H. responded: "No I think they're realistic for a . . . crime or crimes that were—had such aggravating, is that the word, circumstances."

Under questioning by the prosecutor, E.H. acknowledged that she was philosophically opposed to the death penalty and that if the choice were hers, the state would not authorize capital punishment.

The prosecutor asked in what circumstances E.H. envisioned being able to impose a sentence of death, and she responded: "I guess it would be . . . if there were lots of people killed . . . I guess if you can't take into account someone's previous history, so I guess you're just looking at the current case, so I guess it would be just how awful . . . the current situation was."

The prosecutor stated: "The nature of the case that we have here does not fit what you've described. So I ask . . . is this one that raises its level . . . to really, really awful, where you could consider imposing the death penalty?" E.H. responded that "[i]t might." She agreed when the prosecutor added, "you've told me that you haven't thought too much about it because it's unpleasant to you." When asked whether she could impose the ultimate penalty, she replied: "I'd have to . . . hear the case. I didn't want to think about it in the abstract."

The prosecutor explained that "in order for the punishment of the death penalty being realistic for a—juror, they have to actually be capable of voting to end another person's life. And if they can't do that, if they couldn't bring themselves to do that because they couldn't live with themselves, or for any number of reasons, then the reality is that the death penalty isn't an option for them because they couldn't actually vote for it, no matter what [t]he evidence was. [¶] So I ask . . . knowing yourself and given your philosophical base, and that you oppose the death penalty and don't think we should have death penalty on the books, do you really believe that you could actually vote to end the life of another person?"

E.H. responded: "Depending on the facts of the case, that's a possibility that I could." The prosecutor inquired what facts she was referring to, and E.H. responded: "It just seems strange to discuss this because we're discussing the end of the case, and we haven't even . . . heard the evidence."

The prosecutor explained that just as the law provides that the jury in a capital case should not be composed of persons who automatically would vote in favor of death for all murders, the law also provides that the jury should not be composed of persons who never could vote for the death penalty because "realistically, the option of the death penalty doesn't exist for

them. [¶] But if we don't ask these questions, we can't get to those people to confront the issue as to whether this is something that they could actually do."

The prosecutor noted E.H.'s emotional state, asking: "Now, does that upset you? I get a sense that this is very, very uncomfortable for you, and you know, it['s] very . . . irritating." E.H. confirmed that the prosecutor's observation concerning her emotional state was correct.

The prosecutor remarked further on the prospective juror's apparent unease during voir dire: "And the idea of being in the *situation of being asked*, could I actually vote to kill another human being, given the fact that you don't think we should have a death penalty, sort of makes the situation even more uncomfortable?" E.H. answered in the affirmative. The prosecutor inquired whether "realistically, is this an appropriate case for you . . . given your attitudes and your feelings about the death penalty?"

E.H. responded that she "probably" did not agree "with the philosophy that people that are opposed to the death penalty . . . should be excluded from the case. But I think, besides that, that given the case, that I would consider the case, and there is a possibility I could vote for the death penalty in certain cases." She confirmed that she had "strong feelings" against the rule that a person who could never impose the death penalty should be excluded from a capital jury.

The prosecutor asked whether E.H. believed that capital punishment is "applied more often to minorities and the poor," and she confirmed she held that belief, and that it applied to persons of Hispanic background such as defendant. She nevertheless averred that she could vote to impose the death penalty on a member of a minority group, explaining that "each case is different, [and] . . . if the facts warranted it, I could vote for the death penalty."

The prosecutor pursued the topic of the influence of the juror's views on her performance of her duties in the present case, stating: "When you say it is possible, I mean you're an educated woman, the court didn't haphazardly choose the words, a realistic possibility. Given your attitude against, your opposition to the death penalty, that we shouldn't have it on the books, your attitude that people who oppose the death penalty shouldn't be excluded from death-penalty juries, your long-held position that minorities and the poor are more frequently recipients of the death penalty than other folks, is it truly realistic now that you would ever actually vote to impose the death penalty, honestly?"

E.H. responded: "Well, it's a small percentage, but it's in the realm of possibility." The prosecutor replied: "We're not talking about remote possibilities. We're talking about practical application. [¶] Can you sit there and honestly tell me, ma'am, that you would vote to end his life realistically?" E.H. answered: "It sounds like you and I define realistically differently."

After the prosecutor moved to challenge E.H. for cause, the court posed additional questions, and E.H. explained her view that persons who never would vote for a sentence of death should be permitted to serve on capital juries. She stated: "I think the full range of possibilities should be allowed, particularly if—when you get to the penalty phase, it isn't automatic that it's the death penalty, that there are two choices, that you should have the full range of the community's input."

The court then inquired whether, if a prospective juror informed the court he or she never could impose the death penalty, the juror should be permitted to serve on the jury, and she responded that if she were a legislator, that would be her position.

The court pointed out that the result of such a position would be that the jury never would be able to impose a sentence of death. E.H. responded that perhaps the juror who was a death penalty opponent would "get changed or swayed by the actual situation."

The court continued: "I'm certainly not trying to argue with you, nor am I trying to put words in your mouth or tilt this out of context, but it's that kind of response . . . *sounds like there might be an agenda here, an agenda to achieve some social or political end.* And I'm concerned about that. If I'm wrong, please tell me. And I may very well be wrong." (Italics added.) E.H. declared that the court was in error, adding, "I'm just trying to be as candid about where I am, and I'm not coming with a hidden agenda, and I have thought about things, and realistically, if I had to put a number on it, it would be like, say 10 percent possibility I could vote for the death penalty."

In ruling upon the prosecutor's challenge, the trial court expressed its concern that Prospective Juror E.H. had "an agenda," also referring to E.H.'s belief that persons who never would impose the death penalty should be permitted to serve as jurors in capital cases. E.H.'s opinion on this point emerged in the questioning during which E.H., evidently through her demeanor, displayed signs that she was "upset" and "irritated." The court added: "Although agenda is too strong a word for [E.H.]. I don't believe she is lying here. I don't believe she came into court to thwart the process. But I am very concerned with any [juror] who will state in an unequivocal way that she . . .

disapprove[s] of a law that would allow the court to excuse someone who is emphatically opposed to the death penalty in all circumstances and wouldn't vote for it, no matter what the evidence showed at a penalty trial," pointing out that such a juror inevitably would prevent the imposition of the death penalty. According to the court, E.H.'s view that such a law concerning jury selection is improper—when combined with other circumstances that the court acknowledged separately would not be grounds for challenge, such as her "moderate" opposition to the death penalty and her view it was imposed more frequently on minorities and the poor—gave the court the "definite impression that she would be unable to faithfully and impartially apply the law."

Reviewing the cold record with the appropriate level of deference, we conclude that the trial court did not abuse its discretion. Again, this court has reviewed the full transcript of the extensive voir dire of E.H., and is impressed with the court's care and thoughtfulness. The court stated the correct standard and acknowledged that persons who are opposed to the death penalty may not be excused for that reason alone. In addition, the court evidently was sensitive to the demeanor of the jurors. (See pp. 442–444, *post.*) The record reflects that E.H. displayed visible emotion when challenged concerning her ability to consider imposing the death penalty, as well as when she learned that the law permitted the exclusion of prospective jurors who were unalterably opposed to the death penalty. She characterized herself as strongly opposed to the latter rule. Although the court rejected the notion that E.H. had committed perjury during voir dire, she evidently gave the court the impression that, even if she did not have a precise "agenda," her attitude toward the process of imposing punishment was far from open-minded. Like Prospective Juror B.S., E.H. acknowledged there was merely a small possibility she ever could vote in favor of a verdict of death. Moreover, as with B.S., the record supports the inference that E.H. was resistant to the prosecutor's efforts to probe her willingness to return such a verdict. Also, like B.S., E.H. did not suggest she could put aside her own views concerning the death penalty and participate in the trial purely on the basis of the law under which she was instructed. Rather than deferring to existing law, the prospective juror offered merely a small possibility that her own scruples would permit her to reach a verdict of death for an especially heinous crime. The court could infer she would be unable to afford the prosecution " 'a fair hearing and a fair opportunity to at least persuade [her] to [vote for] the death penalty.' " (*People v. Hamilton, supra,* 45 Cal.4th at p. 891.)

Defendant seizes upon the court's reference to E.H.'s opposition to the death penalty, relying upon the rule that we have acknowledged above that firm opposition to the death penalty does not disqualify jurors who clearly state a willingness to "set aside their own beliefs in deference to the rule of law." (*Lockhart v. McCree, supra,* 476 U.S. at p. 176.)

Examining the voir dire of Prospective Juror E.H. as a whole, and applying the appropriate deferential standard, we conclude that this juror was not excused simply because of her opposition to the death penalty. The trial court in the present case referred to a number of circumstances it believed combined to disqualify her, including her views on the composition of capital juries and on the application of the death penalty to members of ethnic minorities. As noted, E.H. also displayed visible emotion during the prosecutor's questioning, a circumstance that supports the trial court's evaluation of her demeanor. She agreed with the prosecutor's characterization of her as upset, uncomfortable, and irritated by questioning on a topic considered significant by the trial court, namely the juror's view that persons unalterably opposed to the death penalty should be permitted to serve on capital juries. The trial court was concerned that Prospective Juror E.H. had, if not exactly "an agenda," at least a combination of views that would, despite the potential juror's evident good faith, substantially impair her ability to abide by her oath as a juror. In distinguishing the present case from those in which a trial court has excused a potential juror simply because of the individual's opposition to the death penalty, we also observe that it is significant the trial court stated it *understood* that a juror who is opposed to the death penalty cannot properly be excused for cause for this reason alone.

 The United States Supreme Court has counseled reviewing courts to afford considerable deference to the trial court's impressions concerning the ability of a prospective juror to serve on a capital case. (*Uttecht v. Brown, supra,* 551 U.S. at pp. 7–9.) As the high court commented in *Uttecht,* the trial court is in the best position to view the juror's demeanor and to give weight to the juror's body language, demeanor, and attitude. We defer to the trial court's superior ability to assess the prospective juror's demeanor and, in view of all the circumstances, conclude that substantial evidence supports the trial court's conclusion that this prospective juror's views would prevent or substantially impair her ability to perform her duties according to the law.

Accordingly, we reject defendant's claim that the trial court improperly excused Prospective Jurors B.S. and E.H. for cause.

### 3. *Asserted unfairness in the application of the* Witt *standard*

Defendant contends the trial court applied a stricter standard to prospective jurors who disfavored the death penalty than the court applied to prospective jurors who favored that penalty. Defendant describes the trial court's asserted standard as follows: "For pro-death jurors, the standard was: a pro-death juror is qualified if he or she makes a commitment to listen to mitigating evidence and consider life [in prison] without parole as a possible sentence, regardless of the strength of his or her general feelings about the need to impose the

death penalty. . . . For pro-life jurors, the standard was that a pro-life juror is disqualified if he or she not only makes a commitment to listen to the evidence and consider a death verdict as a realistic possibility, but also has general philosophical views which the trial judge views as not too strong."

Defendant also claims the trial court displayed a bias in favor of prospective jurors who supported the death penalty, using its "power to question prospective jurors disparately to ask favorable, rehabilitating questions to pro-death jurors and hostile, disqualifying questions to pro-life jurors." Defendant summarizes: "The point here is not that it was in any way improper for the trial judge to attempt to rehabilitate pro-death jurors. The point is that the judge took no similar steps to rehabilitate pro-life jurors. [Indeed] [t]he court's brief questioning of [B.S.] was framed to elicit disqualifying answers."

Defendant claims that the actions of the trial court violated his federal constitutional guarantees of due process of law, trial before an impartial jury, and equal protection of the laws. He contends that the trial court's asserted bias should cause this court to withdraw any deference otherwise owed to the trial court's conclusions concerning the challenges to Prospective Jurors B.S. and E.H.[8]

Defendant's argument rests upon the record of the voir dire of three persons, two of whom ultimately did not serve as jurors, and one of whom served only as an alternate but was not called upon to deliberate. Defendant places principal reliance upon the examination of Prospective Juror D.F., as to whom the court denied a defense challenge for cause. Defendant claims D.F. was less qualified to serve than either B.S. or E.H.

In questioning D.F., as in its questioning of B.S. and E.H., the court attempted to ascertain whether both punishment options were realistic and

---

[8] Respondent contends defendant's claim that the trial court employed different standards for the two types of jurors and exhibited bias in its questioning is forfeited because it was not raised below. Although we previously have determined that a claim that the trial court committed misconduct during its voir dire examination—for instance, by assertedly posing questions implying the court believed the defendant to be guilty—is forfeited if not raised at trial (*People v. Seaton* (2001) 26 Cal.4th 598, 635 [110 Cal.Rptr.2d 441, 28 P.3d 175]; see also *People v. Heard, supra*, 31 Cal.4th at p. 958, fn. 8; *People v. Freeman* (1994) 8 Cal.4th 450, 487 [34 Cal.Rptr.2d 558, 882 P.2d 249]), the issue in the present case appears to be somewhat different. Defendant claims that the responses of the other jurors, along with the court's asserted lack of evenhandedness, demonstrate that the court erred in applying the *Witt* standard to B.S. and E.H. We reached the merits of similar claims in *People v. Thornton, supra*, 41 Cal.4th 391. In addition, during an examination discussed *post*, at page 444, defense counsel did compare his own belief that the prospective juror had a *pro-death* "agenda" with earlier questioning that, he noted, had been regarded by the trial court as having disclosed an anti-death-penalty agenda on the part of another prospective juror, and in response the trial court considered whether it had been evenhanded. (See p. 444, *post.*)

practical possibilities in the mind of the prospective juror—as opposed to being foreclosed by personal views. The court stated: "It's not enough that they might both be theoretically available or hypothetically available, we're interested to know if they are both in realistic practical terms available to choose from . . . depending entirely on what the evidence showed that juror and how that juror evaluated that evidence."

Prospective Juror D.F. responded that both punishment options were open to him. Although he "leaned" toward the death penalty, he also referred to the need to hear all the evidence and agreed that the lesser punishment would be a practical possibility for him. He was cautious concerning his ability to reach a decision to impose the death penalty, stating: "It would be very definitely a very big decision, a very tough decision, but I think if I heard enough facts that sounded something very severe, I think I could do it." The prosecutor identified the charges in the present case and described the process of lethal injection, asking whether D.F. actually could supply the 12th vote to impose a sentence of death upon defendant. D.F. responded: "To be honest I don't really know unless the time came, but I would think if I truly thought, you know, that these criteria were met, I think I could. But yeah, to be honest until that time happens I don't know."

D.F. added, "I could reasonably vote for the death penalty, I could reasonably vote for life without parole, even though I have a leaning." The prosecutor asked whether D.F. fell into the automatic-vote-for-death category or the leaning-toward-death category. D.F. stated: "I would think I would wait until I hear all the evidence before I truly made up my mind one way or the other. I may be leaning but yeah, I would still want to hear all the evidence." On a scale of one to 10, D.F. explained he was an "eight-and-a half" in support of the death penalty.

Defendant suggests D.F.'s further responses under *defense* questioning also disclosed he was less qualified to serve than B.S. or E.H., and defendant asserts that the court's failure to excuse D.F. supports defendant's claim the court applied a different standard to the two categories of prospective jurors. D.F. agreed that it was possible he could vote for life imprisonment, stating, "I would definitely be leaning towards death, but possibly." He continued: "Probably if I had to really think more in depth about what possibility would lead me to vote for life in prison without the possibility of parole, I probably couldn't come up with any examples. It probably would have to be something really fairly substantial which I can't even think of to lean towards the other sentence." He added: "It's really tough without knowing everything else but just from that sound alone I don't think I could. I would definitely lean towards [the] death penalty." Defense counsel pursued the point: "Well, lean towards is not close my mind, right?" D.F. responded:

"Yeah, well to say yeah, I would vote for the death penalty in those circumstances without knowing anything else about the case."

D.F. agreed with defense counsel that "there's no information to which [he] would foreclose [himself]," but when defense counsel inquired whether if the charges were proven, a verdict of death would be a foregone conclusion, D.F. responded: "From the sound of it now, from just the little I know, I would undoubtedly be leaning that way, yeah. It would be a foregone conclusion. I can't think of anything that would change my mind to think that would not be the right punishment."

D.F. further acknowledged that in his response to the questionnaire, he stated the penalty should be based upon the nature of the crime, not the evidence in mitigation. Defense counsel inquired: "So no matter how much good we showed you about someone who did murder and murder in the course of child molest, you would always vote for the death penalty?" D.F. responded: "Yeah, I would agree with that. I would think I would think in these terms without—it wouldn't matter what this other stuff was about; what you are saying I think, yes, I would vote for the death penalty."

The court thereafter posed supplemental questions, and defense counsel subsequently conceded that if the court relied upon D.F.'s responses to these supplemental questions, there would not be a basis for a challenge for cause. On appeal, however, defendant claims the court purposefully rehabilitated D.F., but refrained from similar rehabilitative questioning of Prospective Jurors B.S. and E.H., thereby assertedly demonstrating bias in its decision to excuse the latter prospective jurors.

In its supplemental questions, the court explained the meaning of mitigating and aggravating evidence and other matters peculiar to the penalty phase. The court inquired of D.F. whether he believed that if defendant was guilty of murder and murder in connection with a child molestation, "there is no mitigating circumstance—which would be defined as not constituting a justification or excuse for the crime in question, but which could be considered as an extenuating circumstance in determining the appropriateness of the death penalty—there is no such mitigating evidence that would be sufficient for you to . . . vote for anything but the death penalty?" D.F. responded: "Not that I can think of. It's really tough without hearing it, but hearing these crimes, yeah, I would answer I can't think of anything else and I can't imagine not voting for the death penalty."

The court responded that it recognized it was difficult to decide the matter in the abstract. But, the court asked, assuming there was some evidence in mitigation, "would you still be receptive to listening to that evidence? And

when I say listen to it having as a possibility, something more than just theory, but a practical possibility that it might sway, it might convince you that . . . you might still evaluate the case as one where . . . life in prison is appropriate?" D.F. responded: "Possibly, but . . . I have a real hard time because I don't know what it can be, yeah, but if there was something out there that definitely could, there was some sort of extenuating circumstance I would definitely be willing to listen to it." The court inquired whether D.F. not only could listen, "but there is a part of your mental process reserved for choosing either penalty option or do you think the listening is simply a formality, but that your mind could not be swayed?" D.F. responded: "No, if those mitigating circumstances were there, something substantive like how I could change my mind, yeah, then I could be swayed."

Defense counsel moved to excuse D.F. for cause, although he offered a concession that D.F.'s answers to the court's supplemental questions made it "real clear to me that those questions of the court undermine my challenge for cause. And that my challenge for cause is appropriate only if your honor is willing to draw the inference that this juror was being more revealing of his true state of mind when he said he 'can't imagine not voting for the death penalty' [than] in his direct response to the court's question."

The court denied the challenge, stating: "I'm couching my ruling not only on the discussion I had earlier which I will incorporate, but I did ask him supplementary questions and, you know, I think the supplemental questions that I asked have indicate[d] that while he may be leaning towards the death penalty based on hypothetical questions being asked in this case by [the prosecutor], I don't believe he has foreclosed the possibility and *I judge him from looking at his demeanor and listening to the way in which he answers questions*. In watching him I don't believe he has foreclosed a realistic and practical possibility that he could impose either punishment." (Italics added.) The court explained further that laypersons naturally cannot imagine the nature of mitigating evidence, and the court posited this was why D.F. stated he could not imagine voting for any sentence other than death. The court observed that it "will excuse if it has a definite impression that the juror's views prevent or substantially impair the performance of his duties in according with the instructions of his oath . . . and that involves a lot of subjective decisions . . . on the part of the trial judge."

On appeal, defendant also refers to the questioning of Prospective Juror No. 16.[9] The court overruled the defense challenge for cause as to this prospective juror, who ultimately served as an alternate but was not called upon to deliberate.

---

[9] Some of the prospective jurors evidently were addressed by name, whereas some were addressed by number.

In her questionnaire, Prospective Juror No. 16 indicated support for capital punishment, a belief that capital punishment serves as a deterrent, and an assumption that a person found guilty of murder deserves the penalty of death.

During voir dire, the court inquired whether she believed that only the death penalty would be appropriate for the crime of murder. The prospective juror responded: "Not necessarily. I've been thinking a lot after filling this out. It would all depend on, you know, my impression [of] whatever we heard as a juror. The—I'm an honest and truthful person, and I think that if I felt that that was what the person deserved, then that's the way I would vote, but if there was any doubt, then I wouldn't." The court asked whether, even if she found defendant guilty of murder and found the special circumstance true, "are you saying that there would still be a reasonable, realistic possibility that, despite what you've said here and what you feel, you could vote for life in prison?" The prospective juror answered: "As you said, you have to balance it out and—whatever the information is, then you would have to balance it truthfully or honestly and decide if you felt that what the circumstances were warranted it or not. It could go either way."

The court responded that its initial impression of the prospective juror was that she would not be able to consider any penalty but death if the murder and special circumstance were proven, and the court suggested: "I thought maybe that might be your frame of mind." The prospective juror responded: "Not necessarily," again confirming that both penalties were a realistic and practical possible choice for her.

In response to the prosecution's questions, Prospective Juror No. 16 stated it would be difficult and emotional for her to make a decision to impose the death penalty, but she believed she could reach such a decision. She acknowledged she had strong feelings concerning crimes against children, but stated she would be capable of listening and making up her own mind concerning penalty, and would "not necessarily" vote for death. She rated herself as a seven out of 10 in terms of her support for capital punishment.

When the defense inquired whether she always would vote for the death penalty in cases involving child molestation, she responded: "I find that hard to say, just to say yes. Then you're saying, you know, that I've made up my mind." She repeated that she could vote for either penalty, depending upon the evidence. Defense counsel inquired whether she believed prison consti-tuted an adequate penalty, and she equivocated, characterizing some prisons as resembling "Club Med." Again, she informed counsel that she found it difficult to predict her vote when she was unaware of the circumstances of the case, and never had participated in a capital trial. She reminded counsel that

jurors are instructed to approach the evidence with an open mind, but that he was asking her to admit "it is in cement that I would vote for the death penalty. And I say I don't know." She stated she would give defendant a fair hearing.

Defense counsel moved to excuse the juror, referring to her manner and to defense counsel's belief that she "had an agenda." Counsel stated: "It just looks that way to me as firmly as it looked that other people have had an agenda for the defense."

The court acknowledged that demeanor was important to its determination, and invited defense counsel to explain aspects of the prospective juror's demeanor that suggested an "agenda." Defense counsel responded that the prospective juror's answer referring to some prisons as resembling "Club Med" indicated a view that prison did not constitute severe punishment, and counsel also referred to "the various relatively lengthy pauses that she had at one point or another." Defense counsel expressed disbelief in the juror's claim that she had softened her views since the time she completed the juror questionnaire.

The court observed that it had been "sensitive to jurors who might be perceived to have an agenda," adding it did not believe Prospective Juror No. 16 "wants to get on this jury to achieve some goal." The court stated its view that the prospective juror's answers to the written questionnaire reflected a person who "has, for practical purposes, excluded one of the two penalty options." At the same time, the court credited the juror's claim that she had thought more deeply concerning capital punishment after completing the questionnaire. The court noted its view that the juror's pauses during questioning arose from the forcefulness of the defense questioning, and commented it did not believe the prospective juror was lying.

The court also observed that it had reflected upon whether it was "being consistent with myself in this analysis, and I think I am." The court added: "I'm very sensitive to . . . such things as body language, unspoken pauses . . . . But I don't see those things in her spoken words or unspoken communications as indicating she can't serve." The court denied the defense challenge.

The court subsequently set aside its decision denying the defense challenge, expressing the concern that it should not have compared Prospective Juror No. 16 to other prospective jurors, and also noting that at one point the court had interjected an unfounded criticism of defense counsel (for suggesting the court had directed the juror to change her views).

When the court reconsidered the challenge (ultimately overruling it again), it stated that the juror's questionnaire in isolation would disqualify her, but

that her answers to the court's and counsel's questions reflected she had thought deeply about the matter after completing the questionnaire. The court added that it believed her "post-questionnaire conversion" was sincere and genuine. The court noted that it had "looked at her demeanor, . . . watched and listened to the pauses, and tried to see whether or not they reflected . . . intent to deceive . . . us or deceive herself. [¶] I didn't read it that way. I really did not." As noted, the court then again overruled the defense challenge for cause as to this juror, allowing her to serve (as an alternate).

Defendant also refers briefly to the court's questioning of Prospective Juror A.S., who supported the death penalty "for an offense as capital as taking a life unless there are extenuating circumstances." In response to the court's questions concerning his willingness to consider both penalties, the prospective juror responded he could consider both penalties, but had "a tough time understanding" the purpose of life imprisonment for someone who is judged so dangerous he can never return to society. "Maybe that's a narrow-minded thought, but . . . what would be the evidence that would support life [in prison] without possibility of parole, but yet wouldn't support the death penalty? I guess I'm a little confused where the line would be drawn."

The court expressed "serious concerns" that A.S. might not be able to return any verdict but death for murder with special circumstances. A.S. responded that he supported death for murder with special circumstances as an abstract matter, but "I haven't heard everything there is to hear." As the court had done with other jurors, it acknowledged the difficulty of predicting a decision on the basis of speculation, but asked for the juror's best judgment, inquiring: "Given the fact that you may have leanings towards the death penalty, do you believe that it is still a realistic and practical possibility that there could be extenuating evidence, for example presented [at] a penalty phase trial that could nevertheless convince you that in this particular case life in prison is the appropriate choice?" The prospective juror conceded it was possible for him to change his mind.

We have considered the questions posed by the court to Prospective Jurors D.F., No. 16, and A.S., but reject defendant's claim that the court's inquiry exhibits bias or the application of inconsistent standards with respect to Prospective Jurors B.S. and E.H. Decisions concerning the qualifications of prospective jurors to serve rest within the " 'wide discretion' " of the trial court, and the *manner* of the court's conduct of voir dire is " 'seldom disturbed on appeal.' " (*People v. Thornton, supra,* 41 Cal.4th at p. 420.) Moreover, the record does not establish that the court applied different standards to the prospective jurors identified by defendant, depending upon their attitude toward the death penalty.

The court inquired of each prospective juror whether there was a practical, realistic possibility that he or she could vote in favor of either penalty verdict. Moreover, we are not persuaded that Prospective Jurors B.S. and E.H. were so demonstrably more open-minded concerning penalty than Prospective Jurors D.F., No. 16, or A.S. that the court must have employed different standards or been motivated by bias in ruling on the challenges to each juror. Rather, unlike B.S. and E.H., whose answers supplied a substantial basis for concluding that they never would vote for the penalty of death, or in any case would not afford the prosecution a fair hearing and opportunity to persuade them to vote for the penalty of death, "the death-favorable jurors of whom defendant complains clearly indicated their ability to consider circumstances in mitigation, to withhold judgment upon the question of penalty until the evidence was before them, and seriously to entertain the option of imposing a sentence of life [in prison] without possibility of parole." (*People v. Jenkins* (2000) 22 Cal.4th 900, 989 [95 Cal.Rptr.2d 377, 997 P.2d 1044].) Additionally, the court's statements indicated it was particularly "sensitive" to and observant of the demeanor of prospective jurors in reaching its conclusion regarding eligibility for jury service in a capital case, and nothing in the court's conduct of voir dire indicates we should withhold deference to its ability to evaluate and rely upon the jurors' demeanor in making its rulings in this matter.

■ As for the court's asserted efforts to "rehabilitate" Prospective Jurors D.F., No. 16, and A.S., and the claim these efforts disclosed bias on the part of the court, we ordinarily defer to the court's determination that a prospective juror's answers require clarification. Although the prospective jurors challenged by the defense and identified on appeal initially may have appeared unable to be fair to defendant, after questioning, the court legitimately was satisfied that they were eligible to serve. As in *People v. Thornton, supra*, 41 Cal.4th 391, "it is evident that the court found it necessary to ask the prospective juror[s] questions to reach a decision about [them], and doing so worked no unfairness to defendant." (*Id.* at p. 422.) And as we commented in that decision, "[w]e see nothing improper in the court's explaining the law to the prospective juror, nor in its failing to engage in a similar dialogue with other prospective jurors whose voir dire did not give rise to the same concerns . . . ." (*Id.* at p. 423.)

■ Although trial courts " 'should be evenhanded in their questions to prospective jurors during the "death-qualification" portion of the voir dire,' " on appeal "[a] reviewing court should not require a trial court's questioning of each prospective juror in the *Witherspoon-Witt* context (. . . *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770]) to be similar in each case in which the court has questions, lest the court feel compelled to

conduct a needlessly broad voir dire, receiving answers to questions it does not need to ask." (*People v. Thornton*, *supra*, 41 Cal.4th at p. 425, citation omitted.)

We observe finally that defendant supplied three examples of asserted rehabilitation of persons who generally supported the death penalty, and compared these examples with the voir dire of two persons who were opposed to the death penalty. The examination of such a small number of prospective jurors constitutes an extremely limited sample of the trial court's overall performance, thereby diminishing the probative value of the examples proffered by defendant to support the inference he would have us draw. More than 150 prospective jurors were examined concerning their views related to the death penalty, during 15 court days of voir dire. When considered in this context, and for the reasons explained above, the examples supplied by defendant fail to establish that the court applied incorrect or inconsistent standards or followed a practice exhibiting bias against prospective jurors who opposed the death penalty.

C. *Asserted Instructional Error at the Guilt Phase*

1. *CALJIC No. 2.21.2*

Defendant claims the trial court's instruction based upon CALJIC No. 2.21.2, concerning the jury's consideration of the testimony of a willfully untruthful witness, violated his constitutional right to due process of law. He contends the instruction served to shift the burden of proof to defendant and rendered the verdict unreliable.[10]

Defendant complains specifically of language authorizing the jury "to reject the whole testimony" of *defendant* himself if the jury found he willfully testified falsely on a material point, "unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." According to defendant, this language permitted the jury to reject all of defendant's testimony, even if that testimony raised a reasonable doubt as to some element of the charged offenses, unless the instruction improperly

---

[10] The trial court delivered the following instruction based upon CALJIC No. 2.21.2: "A witness, who is willfully false in one material part of his or her testimony, is to be distrusted in others. You may reject the whole testimony of a witness who willfully has testified falsely as to a material point, unless, from all the evidence, you believe the probability of truth favors his or her testimony in other particulars." The court already had cautioned the jury that "[d]iscrepancies in a witness' testimony or between his or her testimony and that of others, if there were any, do not necessarily mean that the witness should be discredited," and that "[w]hether a discrepancy pertains to a fact of importance or only to a trivial detail should be considered in weighing its significance." (See CALJIC No. 2.21.1.)

imposed the burden on defendant of proving that the "probability of truth favors his or her testimony in other particulars."

We have rejected substantially identical attacks upon CALJIC No. 2.21.2 on many occasions, and decline to reconsider our conclusion. (*People v. Crew* (2003) 31 Cal.4th 822, 848 [3 Cal.Rptr.3d 733, 74 P.3d 820]; *People v. Maury* (2003) 30 Cal.4th 342, 428–429 [133 Cal.Rptr.2d 561, 68 P.3d 1]; *People v. Beardslee* (1991) 53 Cal.3d 68, 94–95 [279 Cal.Rptr. 276, 806 P.2d 1311].) " 'The qualification attacked by defendant as shifting the burden of proof . . . is merely a statement of the obvious—that the jury should refrain from rejecting the whole of a witness's testimony if it believes that the probability of truth favors any part of it. [¶] "Thus [the instruction] does nothing more than explain to a jury one of the tests they may use in resolving a credibility dispute." ' . . . When [the instruction] is considered in context with CALJIC Nos. 1.01 (consider instructions as a whole) and 2.90 (burden of proof), 'the jury was adequately told to apply CALJIC No. 2.21.2 "only as part of the process of determining whether the prosecution had met its fundamental burden of proving [defendant's] guilt beyond a reasonable doubt." ' " (*People v. Maury, supra,* 30 Cal.4th at pp. 428–429, citations omitted.)

Defendant contends the burden-shifting effect he detects in the pattern instruction was exacerbated in the present case by the prosecutor's closing argument. In our view, however, that argument does not provide a basis for distinguishing the present case from the cases cited above.

The prosecutor discussed various aspects of the evidence presented by the prosecution that cast doubt upon defendant's testimony that he killed White during an altercation but had no contact with Tara. The prosecutor carefully reviewed each element of defendant's testimony and suggested that defendant willfully fabricated numerous aspects of that testimony to rebut the inculpatory evidence presented by the prosecution. The prosecutor directed the jury to consider the instruction concerning untruthful witnesses. He paraphrased CALJIC No. 2.21.2, stating: "A witness willfully false in one material part of his testimony is to be distrusted in others. You may reject the whole testimony . . . if [he] willfully testified falsely as to a material fact. Reject everything he said. Unless from all the evidence you believe the probability of the truth favors his testimony in other particulars."

The prosecutor continued: "In other words, you can reject all his testimony if he testified falsely as to a material fact, and you're to distrust everything else he has to say. *And the only time you can accept anything he has to say as true* after you have caught him in a lie on a material issue, is if all the other evidence, not his testimony, but all the other evidence goes to show the probability that what he said is true. And you don't have that here because all

the other evidence points in the opposite direction, of complete falsehood and lies by him." (Italics added.) The prosecutor then specifically acknowledged the People's burden of proof: "What has to be established by the evidence, what I have to do is to prove beyond a reasonable doubt that these crimes have been committed and that he did it. And you've heard for the last two hours . . . that that evidence proves beyond a reasonable doubt that he did it and that he committed these crimes."

Defendant contends it is reasonably probable this argument misled the jury into shifting the burden of proof. We disagree. It is highly unlikely that the prosecutor's argument persuaded the jury to ignore defendant's entire testimony, because much of that testimony was inculpatory and supported the case against defendant for the murder of White. (See *People v. Beardslee*, *supra*, 53 Cal.3d at pp. 94–95.) Moreover, the jury was directed to follow the instructions on the law as given to it by the court, and to disregard any contrary statements by counsel. The instruction given to the jury "at no point *require*[*d*] the jury to reject any testimony; it simply state[d] circumstances under which it *may* do so." (*Id.* at p. 95.)

## 2. *Consciousness of guilt instructions*

Defendant contends that the court committed error by delivering pattern instructions permitting the jury to infer consciousness of guilt from defendant's attempt to persuade a witness to provide false evidence, or from evidence of his flight from the crime scene. (See CALJIC Nos. 2.04, 2.52.)[11] He argues that in cases in which a defendant has admitted his identity as the perpetrator of a crime, the instructions "invite the jury to use evidence whose only rational use is to determine the identity of a perpetrator for an irrational purpose—as evidence that other elements of the crime[ had] been established."

We have rejected this argument in prior decisions, and defendant proffers no persuasive basis for reconsideration. (See *People v. Zambrano* (2007) 41 Cal.4th 1082, 1159–1160 [63 Cal.Rptr.3d 297, 163 P.3d 4], disapproved on other grounds in *People v. Doolin, supra*, 45 Cal.4th at p. 421, fn. 22, and

---

[11] The court delivered the following instruction based upon CALJIC No. 2.04: "If you find that the defendant attempted to or did persuade a witness to provide false evidence, such conduct may be considered by you as a circumstance tending to show a consciousness of guilt. However, such conduct is not sufficient by itself to prove guilt, and its weight and significance, if any, are matters for your determination." The court also delivered the following instruction based upon CALJIC No. 2.52: "The flight of a person immediately after the commission of a crime, or after he is accused of a crime, is not sufficient in itself to establish his guilt; but is a fact which, if proved, may be considered by you in the light of all other proved facts in deciding the question of his guilt or innocence. The weight to which such circumstance is entitled is a matter for the jury to determine."

cases cited; *People v. Jackson* (1996) 13 Cal.4th 1164, 1224 [56 Cal.Rptr.2d 49, 920 P.2d 1254].) Contrary to defendant's claims, the instructions do not suggest that evidence of a defendant's consciousness of guilt serves to support an inference of the existence of a particular mental state or degree of culpability. (*People v. Jackson, supra,* 13 Cal.4th at p. 1224.) "[W]e have repeatedly rejected the argument that instructions on consciousness of guilt, including instructions regarding the defendant's flight following the crime, permit the jury to draw impermissible inferences about the defendant's mental state, or are otherwise inappropriate where mental state, not identity, is the principal disputed issue." (*People v. Zambrano, supra,* 41 Cal.4th at p. 1160.)

### D. Appellate Counsel's Access to Tara's Juvenile Dependency Case File

Prior to the preliminary hearing and almost six years prior to the trial, the defense requested to inspect Tara's juvenile dependency case file. The request was granted in part. On appeal, defendant's counsel sought full access to the undisclosed portions of the confidential juvenile file, both through his briefing and through a separate request for an order granting him access. Appellate counsel asserted in his request and in his opening brief that denying him unrestricted access to the file would violate defendant's rights to fundamental fairness, due process of law, confrontation, and a reliable penalty determination within the meaning of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution. Defendant contends that, should we deny appellate counsel further access to the juvenile file, this court must review the file to determine whether the trial court erred in failing to afford the defense access to material information contained therein.

As we shall explain, defendant is not entitled to inspect the undisclosed portion of Tara's juvenile file. We have reviewed the undisclosed portion of the file and conclude it did not contain material evidence.

#### 1. Background

At the time of the charged crimes, Tara was under the supervision of the juvenile court as a result of sexual abuse by several men. In 1991, prior to the preliminary hearing, the defense moved in the juvenile court to inspect her file on the theory that Tara's credibility would constitute a critical issue at trial. The motion sought access to materials that indicated "some level of mental instability, . . . prior sexual knowledge due to a previous unrelated molest[ation], . . . or a proclivity for telling falsehoods . . . ."

After reviewing the entire file at a hearing conducted on May 31, 1991, the juvenile court ordered that certain portions of the file be disclosed to the

defense, because they indicated that Tara had been sexually abused in the past and also were pertinent to the issue of Tara's credibility. The juvenile court denied the request with respect to the remainder of the file. The disclosed material principally consisted of psychological assessments of Tara that had been performed at various times between November 1988 and February 1989. In addition, the court ordered the disclosure of recommendations prepared for a 1989 detention hearing in the juvenile court and a jurisdictional report dated January 24, 1991.[12]

The defense filed another motion in the municipal court for inspection of *additional* records concerning Tara that were subpoenaed from Stanford Children's Hospital. Tara had undergone residential psychiatric treatment at the hospital in 1988 and again in 1989, prior to the charged offenses, and had undergone further residential psychiatric treatment in 1991 following the charged offenses. The municipal court conducted a hearing, after which it concluded that the complete records documenting all three periods of psychiatric treatment at Stanford Children's Hospital were to be disclosed to the defense but to be maintained in the court's file under seal.

On September 15, 2004, this court denied defendant's request for an order providing appellate counsel with access to the undisclosed portion of Tara's confidential juvenile court file.

### 2. *Discussion*

 Our order denying appellate counsel's request for access to the undisclosed portion of the sealed file cited *Pennsylvania v. Ritchie* (1987) 480 U.S. 39, 59–61 [94 L.Ed.2d 40, 107 S.Ct. 989] in support. In that case, the defendant was charged with committing sexual offenses against his daughter, and sought to examine confidential records concerning her compiled by the state child protective services agency in connection with the

---

[12] Specifically, the court directed disclosure of a jurisdictional report dated January 24, 1991; a confidential psychological evaluation prepared by the New Haven Unified School District dated February 14, 1989; a psychological assessment report dated January 17, 1989, on the letterhead of Alameda County Health Care Services; a psychological evaluation dated November 11, 1988, on the letterhead of Lucile Packard Children's Hospital at Stanford (Stanford Children's Hospital); a report, on the letterhead of Stanford Children's Hospital, showing an admission date of November 3, 1988, and a discharge date of November 28, 1988; and a document entitled "Recommendation for Order of Detention" in Tara's case, undated, with a handwritten notation concerning a six-month review with the date of December 20, 1989. The documents that the juvenile court declined to disclose to the defense were not listed. During record-correction proceedings, the superior court ordered that the juvenile court file be delivered under seal to this court. The file as originally sent to us, however, did not contain the material that *was* ordered disclosed. After diligent efforts by our clerk's office and the clerk's office of the Alameda County Superior Court, the disclosed portion of the juvenile file was discovered in storage and subsequently was delivered to this court, rendering the juvenile file complete.

alleged abuse. He claimed the file "might contain the names of favorable witnesses, as well as other, unspecified exculpatory evidence." (*Id.* at p. 44.) The United States Supreme Court determined that the trial court had erred by denying the request without inspecting the file. The high court reasoned that the principle of due process of law requires the government to disclose evidence in its possession that is both "favorable to the accused and material to guilt or punishment." (*Id.* at p. 57.) Because pertinent state statutes provided certain exceptions to the general rule of confidentiality for the records at issue, including one applicable when a court of competent jurisdiction orders their disclosure, there was no absolute bar to disclosure. "In the absence of any apparent state policy to the contrary, we therefore have no reason to believe that relevant information would not be disclosed when a court of competent jurisdiction determines that the information is 'material' to the defense of the accused." (*Id.* at p. 58.)

The high court concluded the defendant was "entitled to have the [confidential] file reviewed *by the trial court* to determine whether it contains information that probably would have changed the outcome of his trial." (*Pennsylvania v. Ritchie, supra*, 480 U.S. at p. 58, italics added.) The court emphasized that defense counsel was not entitled to review the entire file to search for evidence that might have some utility in preparing his case. Using language that is particularly relevant here, the court stated: "A defendant's right to discover exculpatory evidence does not include the unsupervised authority to search through the Commonwealth's files. [Citations.] Although the eye of an advocate may be helpful to a defendant in ferreting out information, [citation], this Court has never held—even in the absence of a statute restricting disclosure—that a defendant alone may make the determination as to the materiality of the information. Settled practice is to the contrary. . . . Defense counsel has no constitutional right to conduct his own search of the State's files to argue relevance. [Citation.]" (*Pennsylvania v. Ritchie, supra*, 480 U.S. at pp. 59–60.)

The juvenile court in the present case followed the rule established in the *Ritchie* decision and, pursuant to its authority under Welfare and Institutions Code section 827, reviewed the entire file to determine whether it contained material evidence. As noted, several documents from the juvenile court file were disclosed to the defense.

Defendant contends that *Pennsylvania v. Ritchie, supra*, 480 U.S. 39, is inapposite, because it concerned the accused's right to *pretrial* discovery, whereas defendant's claim in the present case is that appellate counsel must be afforded access to the complete juvenile file for the purpose of determining whether it contains any information that might be helpful to the defense on *appeal*.

■ As has been demonstrated, however, even at trial the defense is not entitled to review confidential documents to determine which are material for its purposes; rather, as occurred in the present case, it is the trial court's duty to review the documents and to determine which, if any, are material and should be disclosed. We perceive no reason that the defense should have a *broader* right of access to privileged material on appeal, particularly when we consider that the defense request concedes that the juvenile and municipal courts ordered disclosure of *substantial* sensitive and embarrassing material from the file and that, on appeal, appellate counsel offers mere speculation that the file *might* disclose *something* that could be the basis for a claim on appeal.

Appellate counsel contends that Tara has a diminished interest in maintaining the confidentiality of the juvenile file because the passage of time has rendered the contents stale. Appellate counsel further contends that because so much information of a highly personal nature was disclosed by the orders of the trial court and the juvenile court, "it is highly doubtful" that disclosure of the remainder of the file's contents "would reveal anything more intrusive than the material already disclosed." Finally, counsel asserts that because Tara is no longer a minor or within the jurisdiction of the juvenile court, one of the rationales for maintaining the confidentiality of the juvenile court file—to avoid interference with the rehabilitative purposes of juvenile court proceedings—is absent. These arguments fail to afford appropriate deference to the statutory policy of maintaining the confidentiality of juvenile case files, and to Tara's interest in avoiding public revelation of additional painful and embarrassing circumstances in her early life.

■ In sum, contrary to defendant's claim that he is entitled to inspect the entire file, "[p]arties who challenge on appeal trial court orders withholding information as privileged or otherwise nondiscoverable 'must do the best they can with the information they have, and the appellate court will fill the gap by objectively reviewing the whole record.' " (*People v. Price* (1991) 1 Cal.4th 324, 493 [3 Cal.Rptr.2d 106, 821 P.2d 610]; see also *People v. Avila, supra,* 38 Cal.4th at p. 606.)

This court's function is to review the confidential records that the juvenile court declined to disclose, in order to determine whether they were material and should have been disclosed. (See *People v. Price, supra,* 1 Cal.4th at p. 493.) "Although courts have used different terminologies to define 'materiality,' a majority of [the United States Supreme] Court has agreed, '[e]vidence is material only if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different. A "reasonable probability" is a probability sufficient to undermine confidence in the outcome.' " (*Pennsylvania v. Ritchie, supra,*

480 U.S. at p. 57, quoting *United States v. Bagley* (1985) 473 U.S. 667, 682 [87 L.Ed.2d 481, 105 S.Ct. 3375].) We also consider the effect of nondisclosure on the investigations conducted by counsel and on counsel's trial strategy. (*People v. Zambrano, supra,* 41 Cal.4th at p. 1132.)

We have reviewed the entire confidential juvenile court and superior court files, and have concluded that the undisclosed information was not material to the defense.[13] In addition, having reviewed the confidential file, we conclude the contents do not support any claim that further disclosure is required to protect defendant's right to a fair appeal. (See *People v. Gurule* (2002) 28 Cal.4th 557, 595 [123 Cal.Rptr.2d 345, 51 P.3d 224].)

### E. *Challenges to California's Death Penalty Scheme*

Defendant contends California's death penalty statute, as interpreted by this court and applied at defendant's trial, violates federal constitutional provisions in various respects. These claims have been rejected in many prior decisions of this court, and defendant offers no persuasive grounds for reconsideration.

The California death penalty statute is not impermissibly broad within the meaning of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, whether the statute is considered on its face or as applied. (*People v. Mungia* (2008) 44 Cal.4th 1101, 1141 [81 Cal.Rptr.3d 614]; *People v. Snow* (2003) 30 Cal.4th 43, 125–126 [132 Cal.Rptr.2d 271, 65 P.3d 749].)

Section 190.3, factor (a) does not permit arbitrary or capricious imposition of a sentence of death in violation of the Fifth, Sixth, Eighth, and Fourteenth Amendments to the United States Constitution, whether considered on its face or as applied. (*Tuilaepa v. California* (1994) 512 U.S. 967, 975–977 [129 L.Ed.2d 750, 114 S.Ct. 2630]; *People v. Williams* (2008) 43 Cal.4th 584, 648 [75 Cal.Rptr.3d 691, 181 P.3d 1035].)

---

[13] Defendant does not explain his reliance upon the right of confrontation guaranteed by the Sixth and Fourteenth Amendments. The plurality opinion in *Pennsylvania v. Ritchie, supra,* 480 U.S. 39, interpreted the right of confrontation as a trial right. (*Id.* at pp. 52–54.) The defendant has no right to confront witnesses against him during an appeal. To the extent defendant claims error under the confrontation clause on the basis of the juvenile court's refusal to order pretrial disclosure of the entire file, we have rejected claims that the Sixth Amendment right of confrontation extends to requiring the granting of pretrial discovery motions. (*People v. Hammon* (1997) 15 Cal.4th 1117, 1128 [65 Cal.Rptr.2d 1, 938 P.2d 986] ["we decline to extend the defendant's Sixth Amendment right[] of confrontation . . . to authorize pretrial disclosure of privileged information"].) Even if the Sixth Amendment right of confrontation applied to the discovery request made in the trial court, our review of the entire file establishes that the trial court's order did not deprive defendant of any material evidence.

Nothing in the federal Constitution requires a penalty phase jury to reach unanimity on the presence of aggravating factors or to agree unanimously that aggravating factors outweigh mitigating factors. (*People v. Williams, supra,* 43 Cal.4th at pp. 648–649; *People v. Morrison* (2004) 34 Cal.4th 698, 730 [21 Cal.Rptr.3d 682, 101 P.3d 568].) Except for prior-violent-crimes evidence and prior felony convictions under section 190.3, factors (b) and (c), the court is not required to instruct on any burden of proof, whether for finding aggravating factors, for determining that aggravating factors outweigh mitigating factors, or for reaching the conclusion that death is the appropriate penalty. (*People v. Cruz* (2008) 44 Cal.4th 636, 681 [80 Cal.Rptr.3d 126, 187 P.3d 970].) In addition, the United States Supreme Court decisions in *Cunningham v. California* (2007) 549 U.S. 270 [166 L.Ed.2d 856, 127 S.Ct. 856], *Ring v. Arizona* (2002) 536 U.S. 584 [153 L.Ed.2d 556, 122 S.Ct. 2428], and *Apprendi v. New Jersey* (2000) 530 U.S. 466 [147 L.Ed.2d 435, 120 S.Ct. 2348] do not compel a different result. (*People v. Williams, supra,* 43 Cal.4th at p. 649.) Rather, " '[u]nlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' " (*People v. Manriquez* (2005) 37 Cal.4th 547, 589 [36 Cal.Rptr.3d 340, 123 P.3d 614].)

The federal Constitution does not require the jury to make penalty phase findings, written or otherwise. (*People v. Williams, supra,* 43 Cal.4th at pp. 648–649.)

The absence of intercase proportionality review does not violate state or federal constitutional principles. (*People v. Crittenden* (1994) 9 Cal.4th 83, 156–157 [36 Cal.Rptr.2d 474, 885 P.2d 887]; see also *People v. Cruz, supra,* 44 Cal.4th at p. 681; *People v. Harris* (2008) 43 Cal.4th 1269, 1323 [78 Cal.Rptr.3d 295, 185 P.3d 727] [questioning the defendant's assertion that this court has "categorically forbidden such review"].)

The use of unadjudicated criminal activity as a circumstance in aggravation does not violate the guarantee of due process of law or render a judgment of death unreliable, and the jury is not constitutionally required to agree unanimously that the prior violent criminal activity has been proven. (*People v. Morrison, supra,* 34 Cal.4th at p. 729.)

As we have held, "[u]se in the sentencing factors of such adjectives as 'extreme' (factors (d), (g)) and 'substantial' (factor (g)) does not act as a barrier to the consideration of mitigating evidence in violation of the federal Constitution." (*People v. Morrison, supra,* 34 Cal.4th at pp. 729–730.)

It is not required by the federal Constitution that the jury be instructed that certain factors may be considered solely in mitigation. (*People v. Morrison,*

*supra*, 34 Cal.4th at p. 730.) The statute and the instruction based upon the statute directing the jury to consider " 'whether or not' " mitigating facts are present, are consistent with the Eighth and Fourteenth Amendments. (*People v. Morrison*, at p. 730.)

The California death penalty scheme does not violate the guarantee of equal protection of the laws by virtue of its failure to afford various procedural safeguards to capital defendants that are applicable in noncapital trials. (*People v. Mungia*, *supra*, 44 Cal.4th at p. 1142; *People v. Cruz*, *supra*, 44 Cal.4th at p. 681.)

We have rejected the contention that the California death penalty scheme violates international law. (*People v. Cruz*, *supra*, 44 Cal.4th at p. 689; *People v. Brown* (2004) 33 Cal.4th 382, 403 [15 Cal.Rptr.3d 624, 93 P.3d 244].)

## III.

## CONCLUSION

For the foregoing reasons, the judgment is affirmed in its entirety.

Kennard, J., Baxter, J., Werdegar, J., Chin, J., and Corrigan, J., concurred.

**MORENO, J.,** Concurring and Dissenting.—I concur in the majority opinion insofar as it affirms the guilt verdict and special circumstance finding. I dissent with respect to the penalty verdict. In my view, Prospective Juror E.H. was improperly excused for cause because of the trial court's determination that E.H. was unable to realistically impose the death penalty. Notwithstanding the deference appellate courts owe to a trial court's determination of such matters, I conclude the trial court erred. Although E.H. professed to be against the death penalty, she was also unequivocal in her willingness to impose that penalty in some circumstances, and to do so in a way that was consistent with California death penalty law, and therefore she was able and willing to perform her duties as a juror in a capital case. Moreover, the trial court explicitly stated that it did not doubt her credibility. I therefore conclude that the trial court erred in determining she would be substantially impaired in performing her duty as a juror. Such error requires reversal of the death penalty verdict.

## I.

I begin with review of pertinent case law. In *Witherspoon v. Illinois* (1968) 391 U.S. 510 [20 L.Ed.2d 776, 88 S.Ct. 1770] (*Witherspoon*), the United

States Supreme Court considered a capital jury selection regime governed by a statute that permitted a challenge for cause whenever a prospective juror was opposed to capital punishment or expressed "conscientious scruples" against such punishment. (*Id.* at p. 512.) In the case before the court, almost half the veniremen had been excused because of qualms about capital punishment. (*Id.* at p. 513.) The *Witherspoon* court concluded that such a regime would deny a capital defendant the Sixth Amendment right to an impartial jury, because a jury in which all persons with reservations about the death penalty were excluded would be a panel "uncommonly willing to condemn a man to die." (*Witherspoon*, at p. 521.) Instead, the court held that jurors may be excluded for cause if they make it "unmistakably clear (1) that they would *automatically* vote against the imposition of capital punishment without regard to any evidence that might be developed at the trial of the case before them, or (2) that their attitude toward the death penalty would prevent them from making an impartial decision as to the defendant's *guilt.*" (*Id.* at pp. 522–523, fn. 21, original italics.)

In *Wainwright v. Witt* (1985) 469 U.S. 412 [83 L.Ed.2d 841, 105 S.Ct. 844], (*Witt*), the court, while reaffirming that the Sixth Amendment is violated by categorically excluding from capital juries those opposed to the death penalty, criticized the *Witherspoon* court's formulation of the proper standard for challenging prospective jurors. In that case, notwithstanding a prospective juror's admission that she believed her personal objections to the death penalty would interfere with her ability to sit as a juror and to determine both defendant's guilt and innocence, the Eleventh Circuit Court of Appeals had concluded that the juror's expression had not met the *Witherspoon* standard of unequivocally stating that she would never vote for the death penalty, and reversed the death judgment. The Supreme Court reversed. The court noted that the jury in *Witherspoon* was given unfettered discretion to impose the death penalty, whereas jurors after *Gregg v. Georgia* (1976) 428 U.S. 153 [49 L.Ed.2d 859, 96 S.Ct. 2909] had their discretion limited and directed by certain statutory criteria. Therefore, the fact that a prospective juror would not "automatically" vote against death was insufficient to protect the state's interest in having jurors who would comply with its statutory capital sentencing scheme. (*Witt, supra,* 469 U.S. at pp. 420–423.) Instead, the court permitted removal for cause when the juror's views would " 'prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath.' " (*Id.* at p. 424.)

The *Witt* court further elaborated that "in addition to dispensing with *Witherspoon*'s reference to 'automatic' decisionmaking, this standard likewise does not require that a juror's bias be proved with 'unmistakable clarity.' This is because determinations of juror bias cannot be reduced to question-and-answer sessions which obtain results in the manner of a catechism. What common sense should have realized experience has proved: many veniremen

simply cannot be asked enough questions to reach the point where their bias has been made 'unmistakably clear'; these veniremen may not know how they will react when faced with imposing the death sentence, or may be unable to articulate, or may wish to hide their true feelings. Despite this lack of clarity in the printed record, however, there will be situations where the trial judge is left with the definite impression that a prospective juror would be unable to faithfully and impartially apply the law." (*Witt, supra,* 469 U.S. at pp. 424–426, fn. omitted.) The *Witt* court also emphasized that, as in other situations involving juror bias, a capital juror's bias based on opposition to the death penalty "involves credibility findings whose basis cannot be easily discerned from an appellate record," and therefore requires considerable deference to the trial court's determination. (*Id.* at p. 429.) The question on review "is not whether a reviewing court might disagree with the trial court's findings, but whether those findings are fairly supported by the record." (*Id.* at p. 434.)

In California, our capital statutory scheme requires that penalty phase jurors weigh various aggravating and mitigating factors in order to determine whether death or life imprisonment without possibility of parole is the proper sentence. Although jurors are statutorily directed to consider such aggravating and mitigating factors, their evaluation of those factors is by its very nature subjective: " 'Each juror is free to assign whatever moral or sympathetic value he deems appropriate to each and all of the various factors he is permitted to consider . . . .' " (*People v. Boyde* (1988) 46 Cal.3d 212, 253 [250 Cal.Rptr. 83, 758 P.2d 25].) For this reason, the standard and burden of proof requirements for determining guilt in criminal proceedings are neither required nor appropriate at the penalty phase of a capital trial. " 'Unlike the guilt determination, "the sentencing function is inherently moral and normative, not factual" [citation] and, hence, not susceptible to a burden-of-proof quantification.' " (*People v. Box* (2000) 23 Cal.4th 1153, 1216 [99 Cal.Rptr.2d 69, 5 P.3d 130].)

Accordingly, it is understood that jurors will bring their values, beliefs, and opinions into the jury room when determining the proper penalty. As we explained in *People v. Kaurish* (1990) 52 Cal.3d 648, 699 [276 Cal.Rptr. 788, 802 P.2d 278] (*Kaurish*): "A prospective juror personally opposed to the death penalty may nonetheless be capable of following his oath and the law. A juror whose personal opposition toward the death penalty may predispose him to assign greater than average weight to the mitigating factors presented at the penalty phase may not be excluded, unless that predilection would actually preclude him from engaging in the weighing process and returning a capital verdict."

As we elaborated in *People v. Stewart* (2004) 33 Cal.4th 425, 447 [15 Cal.Rptr.3d 656, 93 P.3d 271] (*Stewart*): "*Kaurish, supra,* 52 Cal.3d 648,

recognizes that a prospective juror may not be excluded for cause simply because his or her conscientious views relating to the death penalty would lead the juror to impose a higher threshold before concluding that the death penalty is appropriate or because such views would make it very difficult for the juror ever to impose the death penalty. Because the California death penalty sentencing process contemplates that jurors will take into account their own values in determining whether aggravating factors outweigh mitigating factors such that the death penalty is warranted, the circumstance that a juror's conscientious opinions or beliefs concerning the death penalty would *make it very difficult for the juror ever to impose the death penalty* is not equivalent to a determination that such beliefs will 'substantially impair the performance of his [or her] duties as a juror' under *Witt, supra,* 469 U.S. 412. . . . A juror might find it very difficult to vote to impose *the death penalty,* and yet such a juror's performance still would not be substantially impaired under *Witt,* unless he or she were unwilling or unable to follow the trial court's instructions by weighing the aggravating and mitigating circumstances of the case and determining whether death is the appropriate penalty under the law." (First italics added.)

Thus, although we require jurors to set aside their values and biases when determining guilt, and to objectively apply the law as described to them in the jury instructions to the evidence presented, at the penalty phase of a capital trial something quite different is expected. Values, far from being set aside, are the very basis for the juror's decision, albeit guided by certain statutory markers. Accordingly, if we can imagine a hypothetical system in which jurors serve on multiple capital juries, and their voting records can be discovered, juror A, who voted five times for life imprisonment without parole and five times for death, would not necessarily be a more objective or conscientious juror than juror B, who served on the same 10 juries but voted for death nine times out of 10, or juror C, who voted for life imprisonment without parole nine out of 10 times. Although juror B may be strongly predisposed to vote for the death penalty, and juror C against, each would be following his or her oath as long as he or she followed the statutory directive to choose a penalty by weighing aggravating and mitigating circumstances, even though their attitudes toward the death penalty would cause them to differ from each other, and from juror A, as to the weights given.[1]

---

[1] I note that the problem of how to deal with prospective jurors in capital cases who oppose the death penalty may well be a large and growing one. Polls show that about one-third of those surveyed in this state oppose the death penalty, up from only 14 percent in 1989. (See Field Research Corp., The Field Poll, Release #2183 (Mar. 3, 2006) pp. 1–2, 6 (The Field Poll) [poll conducted Feb. 12–26, 2006, showed 63 percent favored and 32 percent opposed the death penalty in California].) The exclusion of one out of three potential jurors because the attitudes toward the death penalty might predispose them to vote for life imprisonment without

There are two types of challenges that prosecution or defense counsel may exercise to remove prospective jurors—challenges for cause (Code Civ. Proc., § 227) and peremptory challenges (*id.*, § 231)—and in a capital case, each side has 20 peremptory challenges (*ibid.*). In practice, peremptory challenges often are used to remove prospective jurors in whom bias is perceived, but where that bias does not rise to the level supporting a challenge for cause. (See *People v. Wheeler* (1978) 22 Cal.3d 258, 278–279 [148 Cal.Rptr. 890, 583 P.2d 748].)

Therefore, in a capital case, when a prosecutor is faced with a prospective juror who expresses opposition to the death penalty, he or she may pursue two routes to removing that person. First, if it can be gleaned from voir dire that such opposition would essentially prevent the prospective juror from voting for the death penalty, or from following the statutory scheme governing capital cases, he or she may be removed for cause. If, on the other hand, it appears from voir dire that the prospective juror can set aside categorical opposition to the death penalty, can engage in the weighing process and under some realistic circumstances impose the death penalty, but the person's opposition to the death penalty makes it less likely that he or she will impose that penalty, the prosecution may exercise a peremptory challenge to remove the juror. Although the determination is not necessarily easy, a trial court must not confuse the two types of jurors, and if it appears from the record that the trial court excused for cause a juror who was able to engage in the weighing process and impose the death penalty, even though that juror's opposition to capital punishment would "make it very difficult for the juror ever to impose the death penalty . . ." (*Stewart, supra*, 33 Cal.4th at p. 447), an appellate court must find error.

On the other hand if a prospective juror equivocates during voir dire on the question of whether she can fulfill her oath in a capital case, the trial court's determination that she should be removed for cause is binding on appellate courts. (See *People v. Roldan* (2005) 35 Cal.4th 646, 696 [27 Cal.Rptr.3d 360, 110 P.3d 289].) This is because, in evaluating whether equivocal answers indicate substantial impairment, the trial court takes into account the credibility and demeanor of the prospective juror, which appellate courts cannot do. (See *id.* at p. 697.)

## II.

Turning to the present case, as the majority recounts: "In her response to the juror questionnaire, when asked to describe her general feelings regarding

---

parole would indeed result in a jury panel "uncommonly willing to condemn a man to die" in violation of the defendant's Sixth Amendment rights. (*Witherspoon, supra*, 391 U.S. at p. 521.)

the death penalty, Prospective Juror E.H. wrote: 'I used to be strictly against it—particularly because it was applied to poor or minority persons more so than others. Now—I might be able to vote for the death penalty—if a crime was really, really awful.' She added that her views had moved from 'strongly against' to 'moderately against' capital punishment, 'based on hearing of awful crimes and repeat offenders.' Her questionnaire also noted that she would vote against a ballot measure authorizing the penalty of death, because 'it's applied more often to minority and poor' defendants. She nonetheless checked the box on the questionnaire indicating that she did not 'hold any religious, moral feelings or philosophical principle that would affect [her] ability to vote for the death penalty in this case.' " (Maj. opn., *ante*, at p. 433.)

In response to her initial questioning by the trial court, she candidly admitted that she was more inclined to vote for life without parole instead of death. She nonetheless affirmed that she could vote for death, that such a vote was not merely a remote possibility but a realistic one "for a crime or crimes that . . . had such aggravating . . . circumstances."

In response to questioning by the prosecution, E.H. affirmed that she could vote in favor of the death penalty, for example, in situations in which a lot of people were killed, or in which torture was involved. She never indicated that these were the sole sets of circumstances that would warrant her vote in favor of the death penalty. When the prosecutor pointed out that neither was involved in the present case, and that the special circumstance at issue was a murder connected with lewd and lascivious acts on a child under the age of 14, she indicated that she "might" be able to impose the death penalty, and that she would have to hear the facts of the case. In the course of the prosecutor's voir dire, E.H. stated her disagreement with the rule that people opposed to the death penalty who state that there was no realistic possibility of their imposing the death penalty should be excluded from juries, although she reiterated that she did not fall into that category. She also affirmed that, notwithstanding her view that minorities are disproportionately subject to the death penalty, she could impose the death penalty on a member of minority group because "each case is different. . . . [I]f the facts warrant it, I could vote for the death penalty." Pressed by the prosecution about whether her possibility of imposing the death penalty was realistic, she stated: "It sounds like you and I define realistically differently." In the course of their colloquy, in the prosecutor's attempt to probe whether imposition of the death penalty was a realistic possibility for her, he stated that "I get a sense that this is very, very uncomfortable for you, and, you know it's very—it's irritating. Am I right?" E.H. agreed that he was.

Defense counsel declined to question E.H., and the trial court conducted further voir dire. The court stated its particular concern with her position that

people categorically opposed to imposing the death penalty should not be excluded from juries and that, if that were the case, there would be no death penalty verdicts. E.H. affirmed that if she were a legislator, that would be her position, and that such a rule would not necessarily result in no death penalty verdicts because "perhaps that person, with that belief, might get changed or swayed by the actual situation." The trial court expressed concern that her response sounded like "there may be an agenda here. An agenda to achieve some social or political end." E.H. denied having any "hidden agenda" and stated that "realistically, if I had to put a number on it, it would be like, say, 10 percent possibility I could vote for the death penalty."

After hearing from the prosecution and defense counsel, the latter of whom argued vigorously that E.H. should not be excused for cause, the trial court ruled in favor of the prosecution. The court stated that it was a "close and troubling call." It noted again E.H.'s moderate opposition to the death penalty and her view that minorities are disproportionately given the death penalty and stated that it was "troubled, to a degree, by all these things," but acknowledged that they were not, by themselves, reasons to excuse a juror. The court then stated: "I don't believe she is lying here. I don't believe she came into court with the intent to thwart the process. But I am very concerned with any [juror] who will state in [the] unequivocal way that she did in response to one of my questions, I disagree and disapprove of the law that would allow the court to excuse someone who is emphatically opposed to the death penalty in all circumstances and wouldn't vote for it, no matter what the evidence showed at a penalty trial. And she did state that.

"Now, I made it clear that I did not believe that it was her—and I don't and it's clear from her questionnaire and her questions here that that isn't necessarily her. But if that is her view, for someone who does fall into that position, that is a criteri[on] that I need to evaluate[. I]n terms of whether or not it is a realistic and practical possibility that she would ever, under any circumstances, impose the death penalty. In other words, it's a factor for the court to determine in deciding whether or not I have a definite impression that she would be unable to perform her oath.

"Adding all these things together, I have the definite impression that she could not do this, that she could not perform her duty, in accordance with her oath. And by adding all these things together, I am adding together all the various things that we've ascribed to her, the fact that she equates this defendant with a class that she believes are disproportionately the target of capital punishment and the various other things that she's expressed here. All things considered, I thought about this as carefully as I can. I am left with the definite impression that she would be unable to faithfully and impartially apply the law.

"I do not believe she is perjuring herself here. I do not believe she is lying to us. I believe she is honestly expressing her views, as best she can.

"But that's my ruling. And I will excuse her."

Although no one can fault the trial court for what was obviously a conscientious and earnest effort to grapple with this difficult question, the record does not support the determination that E.H. was unable to fulfill her oath. In arriving at this conclusion I first consider the trial court's negative findings. The court concluded that E.H. was *not* lying, and did *not* have a hidden agenda. Thus, although reviewing courts will generally defer to trial courts on matters of credibility, here the trial court made clear it found that E.H.'s statements were credible.

If that is the case, then E.H. was not lying when she said that she could impose the death penalty in some cases, if the circumstances were truly aggravating. Indeed, the trial court expressly concluded that E.H. was not among the class of persons who could never vote for the death penalty. Nor did E.H. take the position that only certain of the statutory special circumstances were worthy of the death penalty. She did not rule out the possibility that she could impose the death penalty in the present case in which the special circumstance was that the murder was committed in connection with the commission of lewd acts on a child under the age of 14.

The trial court found significant E.H.'s view that those categorically opposed to imposing the death penalty should be allowed on juries. But her view on this matter was largely irrelevant to the question of whether she could follow her oath. She merely stated that, if she were a legislator, she would support that rule. She never stated that she would be unable to serve on a jury that would exclude such strong opponents of the death penalty. The question of who should be allowed to serve on a capital jury is a complex one that has bedeviled lawyers, courts and scholars alike. While E.H.'s views on this question were perhaps not fully formed, and she might have altered them with further discussion, she was not, in her view, advocating a method of jury selection that would result in no death verdicts. She believed that some people who professed to be categorically against the imposition of the death penalty might change their minds when asked to serve on a jury sitting in judgment of an aggravated murder—in other words that some of those jurors might undergo the transformation that she herself had experienced of modifying her opposition to the death penalty when faced with the facts of a very aggravated murder. To be sure, if her rule was adopted, fewer death penalty verdicts would result. But her opinion on who should qualify for a capital jury would have bearing on her fitness to serve on a capital jury herself only if it reflected some kind of hidden agenda to qualify for a capital jury in order

to vote against the death penalty. As discussed, the trial court explicitly rejected the notion that E.H. had such a hidden agenda. Indeed, a person with such an agenda would tend to hide or understate his or her true feelings about the death penalty whereas E.H. was, in the trial court's words, "honestly expressing her views."

Nor did her view that minority defendants are disproportionately subject to the death penalty disqualify her. That view does have a basis in fact and is widely shared.[2] As long as this view will not prevent a juror from imposing the death penalty on a minority defendant, it cannot be a basis for disqualifying a juror for cause. Here, E.H. specifically stated that she could impose the death penalty on a minority defendant if the facts warranted it, and the record indicates the trial court believed her statement.

In sum, there is nothing in the record, nor anything in the trial court's remarks, to suggest that E.H. would have subverted a proper determination of guilt or special circumstances. At most, the record supports the conclusion that E.H.'s moderate opposition to the death penalty would "make it very difficult for [her] ever to impose the death penalty . . . ." (*Stewart, supra,* 33 Cal.4th at p. 447.) But as we have held, that difficulty is not to be equated with substantial impairment of a juror's duties. (*Ibid.*) Indeed, Juror D.F., who was not excused for cause, had a strong predilection in favor of the death penalty. Although the prosecution may well have found a peremptory challenge of E.H. appropriate, there is nothing in the record, particularly in light of the trial court finding in favor of E.H.'s credibility, to indicate a substantial impairment that would support a challenge for cause. Whether it misapprehended the distinction that we made explicit in *Stewart* between substantial impairment of a juror's performance of the prescribed duties and a juror's great difficulty in imposing the death penalty, and/or was distracted by the irrelevancy of E.H.'s position regarding who should serve on a capital jury, or for some other reason, the trial court erred in granting the prosecutor's challenge of E.H. for cause.

The majority comes to the contrary conclusion, relying on several considerations. The majority makes much of the fact that E.H. "displayed visible

---

[2] Although the case for the race of the defendant, as an independent factor, affecting the charging and sentencing practices of prosecutors and juries in capital cases is inconclusive (see Liptak, *New Look at Death Sentences and Race,* N.Y. Times (Apr. 29, 2008) p. A10), there is no question that African-Americans in particular make up a much larger proportion of the death row population than of the general population. (NAACP Legal Defense and Educational Fund, Inc., Death Row U.S.A. (Winter 2009) p. 35 [42 percent of those on death row are African-American, as opposed to approximately 12 percent of the general population].) The February 2006 Field Poll on the subject reports that 40 percent of those surveyed agree with the statement "[r]acial discrimination is a big factor in deciding who gets the death penalty, with whites not as likely to be sentenced as blacks, Latinos, and other minorities," with 51 percent disagreeing and 9 percent having no opinion. (The Field Poll, *supra,* at p. 5.)

emotion when challenged concerning her ability to consider imposing the death penalty, as well as when she learned that the law permitted exclusion of prospective jurors who were unalterably opposed to the death penalty." (Maj. opn., *ante*, at p. 437.) But neither E.H.'s irritation with the prosecutor's line of somewhat repetitious questioning, nor her expression of emotion when articulating and defending her positions in an intimidating setting, pointed to her inability or unwillingness to follow her oath. Indeed, if voir dire produces tension between prospective jurors and prosecutors, or otherwise exposes temperamental unfitness, it is a peremptory challenge rather than a challenge for cause that is appropriately exercised. As the United States Supreme Court stated in *Swain v. Alabama* (1965) 380 U.S. 202, 219–220 [13 L.Ed.2d 759, 85 S.Ct. 824] (overruled on other grounds in *Batson v. Kentucky* (1986) 476 U.S. 79 [90 L.Ed.2d 69, 106 S.Ct. 1712]): "[T]he very availability of peremptories allows counsel to ascertain the possibility of bias through probing questions on the *voir dire* and facilitates the exercise of challenges for cause by removing the fear of incurring a juror's hostility through examination and challenge for cause." Furthermore, the trial court in its extensive statement of reasons for granting the challenge for cause did not rely on E.H.'s emotional response during voir dire.

The majority also states: "E.H. did not suggest she could put aside her own views concerning the death penalty and participate in the trial purely on the basis of the law under which she was instructed. Rather than deferring to existing law, the prospective juror offered merely a small possibility that her own scruples would permit her to reach a verdict of death for an especially heinous crime." (Maj. opn., *ante*, at p. 437.) I respectfully disagree with the majority's characterization of E.H.'s responses during voir dire. Although E.H. did not employ the legal jargon that belongs to penalty phase jurisprudence, she did evince an understanding of her role as a juror that is perfectly consistent with our death penalty law. She affirmed that she could realistically impose the death penalty "for a crime or crimes that . . . had such aggravating . . . circumstances," and that she had relaxed her previous strong opposition to the death penalty due to "awful crimes and repeat offenders." Thus, although she was not explicitly asked about weighing aggravating and mitigating circumstances, she avowed that she could and would impose the death penalty for certain murders when there were aggravating circumstances involving either the crime or the criminal record of the defendant. Nor, as discussed above, did she unduly restrict what types of aggravating circumstances could lead her to vote for the death penalty—she mentioned torture murder and multiple murder as examples but she did not rule out murder in the course of committing lewd and lascivious acts on a minor as also worthy of the death penalty if aggravating circumstances were present. She appeared

to be describing, albeit in layperson's terms, precisely the kind of weighing of aggravating and mitigating circumstances that penalty phase juries are required to perform.

The majority compares E.H. to Prospective Juror B.S., who was also excused for cause and also espoused anti-death-penalty views. I believe a comparison between the two jurors is useful but, again, I draw a different conclusion. B.S. indicated on her questionnaire that she was strongly opposed to the death penalty and stated that the death penalty "serves no useful purpose" and "makes killers out of us." (See maj. opn., *ante*, at p. 427.) When asked by the prosecutor if it was realistic that she would ever vote for the death penalty, she responded that "it is not realistic that I would" but "it is realistic that I . . . could," a response the trial court characterized as "verbal gymnastics." The trial court reasonably concluded that a person with such strong views against the death penalty would not follow her oath, notwithstanding the lip service she gave to her ability to impose it. E.H., in contrast, was consistent in explaining that her opposition to the death penalty had moderated and that she could impose the death penalty in some cases of murder with aggravating circumstances. She never expressed the kind of grave moral reservations stated by B.S.—the death penalty makes killers out of us—nor engaged in B.S.'s type of verbal evasion, both of which taken together justifiably led to B.S.'s removal for cause. She made clear that her general opposition, based in large part on her view that minorities and the poor are disproportionately subject to the death penalty, would not preclude her from imposing that penalty on a particular minority defendant when warranted by the facts.

I agree with the majority that E.H. was not disqualified simply because she was opposed to the death penalty. Rather, the trial court appeared to disqualify her because of the views she held—that minorities and the poor are punished disproportionately, that people categorically opposed to the death penalty should serve on juries—and the court's belief that such views would make it difficult for her to impose the death penalty. But as discussed above, that difficulty does not constitute a substantial impairment of her ability to perform her duty as a juror, and there was no indication of substantial impairment, particularly in light of the trial court's credibility findings in favor of E.H. I see nothing in the record, nor in the trial court's reasons for granting the prosecution's motion, that would call into question her ability to engage in the weighing process required by the death penalty statute and, in appropriate cases, vote to impose the death penalty.

The commission of *Witt* error by wrongfully excusing a prospective juror in a capital case requires automatic reversal of the death judgment, but does not disturb the guilt and special circumstance verdicts. (*People v. Heard*

(2003) 31 Cal.4th 946, 966 [4 Cal.Rptr.3d 131, 75 P.3d 53].) Accordingly, I would reverse the capital sentence and remand for a new penalty phase trial.

Appellant's petition for a rehearing was denied September 23, 2009. Werdegar, J., did not participate therein. Moreno, J., was of the opinion that the petition should be granted.